IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
v.                              )          No. 3:10-CR-126
                                )
JASON JENNINGS MELTON,          )          (PHILLIPS/GUYTON)
                                )
                Defendant.      )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on Defendant Melton's Motion to Suppress Defendant's Statement [Doc. 24] and Motion to Suppress Search Warrant and Evidence Recovered, both filed on November 24, 2010. After an extensive briefing schedule, the Court held evidentiary hearings on the motions on March 22 and April 12, 2011. Assistant United States Attorney Kelly A. Norris appeared on behalf of the Government. Attorney Robert L. Vogel[1] represented the Defendant, who was also present for both hearings. At the conclusion of the April 12 hearing, the Court permitted the parties to file post-hearing briefs on or before May 13, 2011, and to reply to any briefs filed by May 27, 2011. The Court reopened the suppression hearing on May 3, 2011, and heard additional testimony with regard to a letter [Doc. 72] from the Defendant, which

_____

[1]On August 4, 2011, the Court substituted [Doc. 94] Attorney Philip A. Lomonaco as the Defendant's counsel of record. The following day, the Court ordered [Doc. 96] that the Defendant be committed for a mental evaluation to assess his sanity at the time of the charged offenses. On January 12, 2012, the Court received the Forensic Report of the Defendant's evaluation.

1

was filed with the Court on April 18, 2011. The Government filed its post-hearing brief [Doc. 79] on May 13, 2011. The Defendant requested [Docs. 80 and 84] and the Court granted [Docs. 81 and 87] extensions of the deadline for filing the Defendant's post-hearing brief [Doc. 83],[2] which was filed on May 28, 2011. The Government filed a reply brief [Doc. 85] on June 9, 2011. The Court took the motions, briefs, evidence, and arguments under advisement on the following day.

## I. POSITIONS OF THE PARTIES

The Defendant is charged with being a felon in possession of a firearm and ammunition on August 12, 2010. The Defendant asks for the suppression of all evidence gained in the August 12, 2010 search of his house pursuant to a search warrant because both the issuance and the execution of the search warrant violate the Fourth Amendment. He argues that the search warrant is invalid because it lacks particularity with regard to the place to be searched. He also contends that the issuing commissioner did not have probable cause to issue the search warrant because (1) no nexus exists between the place to be searched and the criminal activity alleged, (2) the informant is not reliable, (3) the information from the informant is stale, and (4) the affidavit supporting the search warrant contains false information. He maintains that the search warrant was improperly executed, because (1) the search was not confined to his residence, (2) the officers seized items outside the scope of the search warrant, and (3) the execution of the search warrant was not

---

[2]The Court notes that on June 14, 2011, the Defendant filed a *pro se* Notice to the Courts of Defendant's Request to Counsel Concerning Response to Government's Post-hearing Brief [Doc. 86]. In this document, the Defendant states that he is notifying the Court of arguments that he wanted his attorney to make in the post-hearing brief. The Court declines to consider this *pro se* filing because the Defendant is represented by counsel. See E.D.T.N. LR 83.4(c) (providing that "[w]henever a party has appeared by attorney, that party may not thereafter appear or act in his or her own behalf in the action or proceeding").

2

noted on its face.  The Defendant also calls for the suppression of statements taken by Investigator

Jason Butler on August 12, 2010, and by Alcohol Tobacco and Firearms (ATF) Agents on October

12, 2010, because they violate the Fifth and Sixth Amendments.

The Government responds [Docs. 44, 79, and 85] that officers properly searched the

Defendant's home pursuant to a valid search warrant.  Moreover, it maintains that even if the search

warrant was technically invalid, the officers executed the search in good faith reliance on the search

warrant and, thus, the evidence is not subject to the exclusionary rule.  It also contends [Docs. 45,

79, and 85] that the statements made by the Defendant were either given voluntarily after the

Defendant had been advised of and had waived his Miranda rights or were volunteered.


## II.  SUMMARY OF TESTIMONY

At the evidentiary hearings on March 22 and April 12, 2011, the Government

presented the testimony of Lenoir City Police Department (LCPD) Investigator Jason Butler, City

of Loudon Police Department (LPD) Sergeant Robert Scott Newman, Knox County Sheriff's Office

(KCSO) Sergeant and ATF Task Force Officer David Amburn, and ATF Special Agent Lamar

English.

Investigator Jason Butler testified that he had worked for the Lenoir City Police

Department since April 2006.  Investigator Butler stated that he also worked on the Ninth Judicial

District Drug Task Force and the Drug Enforcement Administration (DEA) HIDTA Task Force,

investigating violent and drug crimes. [Doc. 74, pp.17-18]  According to Investigator Butler, in

August 2010, the Knoxville Police Department (KPD) notified the LCPD about a robbery involving

the Defendant Jason Jennings Melton and others from Loudon County. [Doc. 74, p.18] The KPD

stated that a cooperating defendant, who had been arrested on August 4, 2010, was willing to discuss his active role in a robbery ring from Louden County. [Doc. 74, pp.19, 23] Investigator Butler questioned the cooperating defendant. [Doc. 74, p.19] Investigator Butler stated that the confidential defendant said that he lived on the downstairs floor of the residence of the Defendant and Kristine Burgess. [Doc. 74, pp.21-22] The cooperating defendant stated that Ms. Burgess worked in a healthcare clinic in Knoxville, Tennessee. The cooperating defendant said that Ms. Burgess provided the Defendant information from patient records, such as medications prescribed, photographs, and addresses. [Doc. 74, p.23] The cooperating defendant told Investigator Butler that the Defendant, as the leader of the robbery ring, would direct others where and how to commit the robberies. The cooperating defendant identified the Defendant and Ms. Burgess from driver's license photographs. The cooperating defendant told Butler that the Defendant and Ms. Burgess drove a black 2006 Suzuki Forenza, and an officer verified that this vehicle was parked in the driveway of the Defendant's residence. [Doc. 74, pp.24-25] The cooperating defendant also told Butler that he had loaned the Defendant a Garmin GPS unit, which he assumed was still at the Defendant's residence. [Doc. 74, p.24] Investigator Butler stated that he had no reason to believe that the cooperating defendant was lying. [Doc. 74, p.19]

Investigator Butler stated that the KPD told him that the Defendant was the primary suspect in a violent robbery that had occurred in July 2010 in which the Defendant wielded a black, polymer club. [Doc. 74, p.25] Butler testified that the cooperating defendant also said that he had witnessed the Defendant commit a robbery in which he used a black polymer club with a lead center, of the type commonly used to check the air pressure in the tires of large trucks. [Doc. 74, pp.25-26]. The cooperating defendant said that he had seen this club at the Defendant's residence. [Doc. 74,

4

p.26] The cooperating defendant also told Butler that the robbery ring used firearms to commit the robberies and that he had seen the Defendant holding a sawed-off Mossberg 500 shotgun with a wooden stock and a pump at his residence. [Doc. 74, p.26]  The cooperating defendant said that the Defendant was a convicted felon and had served time in prison. [Doc. 74, p.26] This fact was verified by running a criminal history check on the Defendant. [Doc. 74, p.27]  Based upon the information from the cooperating defendant, Investigator Butler sought a search warrant to search the Defendant's residence.

On August 12, 2010, Investigator Butler and Investigator Jerry Maupin presented an affidavit, authored by Butler, to Commissioner Cissy Chapman to obtain a search warrant for the Defendant's residence in Loudon, Tennessee. [Doc. 74, pp.19-20] While applying for the search warrant, Commissioner Chapman found an error in the directions contained on the search warrant and corrected it. [Doc. 74, p.21] Investigator Butler did not present any additional information to Commissioner Chapman. [Doc. 74, p.27]  Commissioner Chapman authorized the search warrant in the early morning hours of August 12, 2010. [Doc. 74, p.27]

Investigator Butler testified that he executed the search warrant at the Defendant's residence between 1:30 and 2:00 a.m. on August 12, 2010. [Doc. 74, p.27] He parked several houses down from the Defendant's residence and walked to the residence, but marked police cars pulled into the Defendant's driveway with their blue lights activated. [Doc. 74, p.28] Investigator Butler knocked on the front door of the residence. [Doc. 74, p.28] The Defendant answered the door, was escorted onto the porch, and was handcuffed behind his back for officer safety, due to the report of guns in the house and based on the Defendant's criminal history. [Doc. 74, p.28] Investigator Butler testified that he had checked the Defendant's criminal history the previous evening and learned that

5

the Defendant, who was in his 30's, had three felony convictions, including convictions for armed robbery and escape. [Doc. 74, p.32] Officers entered the residence and handcuffed Ms. Burgess, who was in the living room. [Doc. 74, p.28] Officers secured the residence and placed a child at the residence in his room. [Doc. 74, p.29] Ms. Burgess was seated at the kitchen table and her handcuffs were removed. [Doc. 74, p.29] Investigator Butler spoke with Ms. Burgess. [Doc. 74, p.29]

Investigator Butler stated that he then returned to the front porch and spoke with the Defendant. [Doc. 74, p.29] The Defendant remained handcuffed behind his back during the entire conversation. [Doc. 74, p.29] Investigator Butler read the Miranda rights to the Defendant, but the Defendant interrupted him about halfway through and said, "I've been through the system before. I know my rights." [Doc. 74, p.30] Investigator Butler told the Defendant that he had to continue reading him his rights. [Doc. 74, p.32] Investigator Butler started again and read them completely. [Doc. 74, p.32] The Defendant seemed to understand his rights and did not ask any questions about them. [Doc. 74, p.32] According to Investigator Butler, the Defendant waived his rights by engaging in conversation after Investigator Butler had read the rights to him and asked if he wanted to speak. [Doc. 74, pp.32-33] He did not have the Defendant sign a rights waiver because he did not have any waiver forms readily available. [Doc. 74, p.33] Investigator Butler characterized the Defendant's tone as "carefree." [Doc. 74, p.30] Investigator Butler did not yell, threaten the Defendant, or draw his firearm while speaking with the Defendant. [Doc. 74, p.31]

Investigator Butler testified that the Defendant told him that he was a member of the Aryan Nation, had served nine years in prison for armed robbery, and was presently on parole. [Doc. 74, p.33] The Defendant admitted handling a Mossberg shotgun in his front yard and to shooting a .380 with a broken handle in his side yard. [Doc. 74, p.33] The Defendant said that he threw the shell

6

casing into the woods but the officers did not find it. [Doc. 74, p.33] The Defendant said that his girlfriend Ms. Burgess worked at the Bearden Healthcare Clinic. [Doc. 74, p.34] When Investigator Butler began questioning the Defendant about armed robberies that had occurred in Knox County, the Defendant said that he did not want to talk anymore. [Doc. 74, p.34] The Defendant said, "Due to my criminal history, I believe I need to talk to a lawyer." [Doc. 74, p.34] Investigator Butler said that he ended the interview at that time. [Doc. 74, p.34] He said that he and the Defendant had been talking about four minutes at that point. [Doc. 74, p.34] During the conversation, the Defendant asked for a cigarette, and Investigator Butler told him that he could have one after they talked. [Doc. 74, p.34] After the interview, the Defendant was moved to the living room couch and given a cigarette. [Doc. 74, pp.35, 39] Investigator Butler stated that the officers did not question the Defendant further but proceeded with the search of the residence. [Doc. 74, p.35]

Investigator Butler stated that the Defendant's residence has two levels, a main level and a basement level. [Doc. 74, p.37] The main level includes a living room, dining room, kitchen, bathroom, and three bedrooms. [Doc. 74, pp.36-38, 58] During the search of the residence, Investigator Butler went down to the basement level, by opening an unlocked door and using an interior staircase that was accessed from a hallway on the main floor. [Doc. 74, pp.40-41] Officers seized two firearms during the search: a sawed-off Mossberg shotgun and a .380 pistol. [Doc. 74, p.40] The shotgun had a wooden stock, a pump, and five rounds of ammunition stored on the side of the stock. [Doc. 74, pp.40, 45] The shotgun was found behind the stove in the kitchen on the main level of the home. [Doc. 74, p.43] It was wrapped in a pair of large black sweatpants. [Doc. 74, p.44] The pistol, which had a broken handle, was found in a back bedroom on the main level. [Doc. 74, p.41] Investigator Butler testified that the pistol matched the one described by Defendant Melton

7

during his statement on the front porch, because it was a .380 with a broken handle. [Doc. 74, p.43]

Investigator Butler testified that after the officers completed the search of the residence and made an inventory of the items seized, he left a copy of the search warrant with the homeowner. [Doc. 74, p.45] He made a return on the search warrant to the Loudon County Clerk's Office and turned a copy of the search warrant in at that time. Investigator Butler later learned from Commissioner Chapman that the Clerk's Office no longer has the return.

On cross-examination, Investigator Butler testified that he first learned of Defendant Melton when he received a call from the KPD about an individual who would tell Butler about robberies that had occurred around town. [Doc. 74, p.47] The individual[3] had been arrested on August 4, 2010, for his involvement in a robbery of a Food City pharmacy. [Doc. 74, p.50] The KPD did not tell Investigator Butler that the individual had lied about the circumstances of his arrest by saying that he had been kidnaped by the robber. [Doc. 74, p.67] KPD Detective Day also gave Butler information about Defendant Melton, who was the subject of an ongoing KPD investigation and who had been identified as a participant and charged with a robbery occurring on July 13, 2010. [Doc. 74, pp.47-48] Investigator Butler stated that the July 13 robbery is the crime discussed in paragraph four of the affidavit. [Doc. 74, p.48-49] He stated that the information in paragraph four came from both the confidential defendant and from the KPD, although he did not know how the KPD learned the information. [Doc. 74, p.49-50].

Investigator Butler stated that on August 11, 2010, he and Investigator Maupin

---

[3]During cross-examination, defense counsel stated that the Defendant believes this individual, the confidential defendant, is Bobby Wright. Although Investigator Butler referred to the individual as Bobby Wright on a couple of occasions [Doc. 74, pp.48-50], the Court did not require him to identify the confidential defendant. [Doc. 74, pp.51-52]

traveled to the KCSO detention facility to meet with the confidential defendant. He said that the confidential defendant gave them specific information about crimes that the confidential defendant had committed with other people and told them that the tools used by the robbery ring were being kept at the Defendant's Loudon County residence. [Doc 74, pp.55, 69] The confidential defendant also told Butler that the Defendant had showed him a sawed-off Mossberg 500 shotgun with a wooden stock and a pump at the Defendant's house, but the confidential informant did not say where the gun was located. [Doc. 74, p.84] Investigator Butler stated that the confidential defendant made statements against his own penal interest. [Doc. 74, p.55] Investigator Butler acknowledged that paragraph four of the affidavit states that the confidential defendant witnessed beating someone with a club, not that the confidential informant participated in the crime. [Doc. 74, p.56-57] He stated that law enforcement corroborated that Kristine Burgess owned a Suzuki Forenza and that it was parked at her residence. [Doc. 74, p.57] The confidential defendant also identified the Defendant and Kristine Burgess from driver's license photographs. [Doc. 74, 59] Although he agreed that having the charging documents for Defendant Melton and the confidential informant would have been helpful in seeking the search warrant, he said that he did not have these documents before he prepared the affidavit. [Doc. 74, pp.67-68]. He also agreed that he did not speak with any robbery victims prior to preparing the affidavit. [Doc. 74, p.71] Investigator Butler said that given the circumstances and the nature of the information they learned, he felt it was urgent to seek the search warrant right away. [Doc. 74, p.68]

Investigator Butler agreed that the confidential defendant and a woman named Holly had lived in the basement level of the Defendant's residence. [Doc. 73, p.15; Doc. 74, p.57] Investigator Butler stated that the basement level of the residence had a large room containing a

kitchen, a bedroom, a living area, and a washer and dryer and a separate bathroom. [Doc. 73, p.14; Doc. 74, p.59]. The downstairs was connected to the main level by an interior stairway, with a door at the top and a door at the bottom. [Doc. 73, p.15; Doc. 74, p.59] Both the main level and the basement level had an entrance from outside. [Doc. 73, p.15] He stated that he verified that the confidential defendant was a convicted felon before he interviewed the confidential defendant. [Doc. 74, p.76]

Investigator Butler testified that approximately ten officers participated in the execution of the search warrant at the Defendant's residence. [Doc. 74, p.83] Immediately upon arriving at the Defendant's residence, Investigator Butler took the Defendant onto the porch. [Doc. 74, p.80] He remained on the porch with Melton for one to two minutes, while other officers secured the residence. [Doc. 74, p.81] Investigator Butler then went inside and talked with Kristine Burgess at the dining room table, while other officers waited on the porch with the Defendant. [Doc. 74, p.81] Ms. Burgess's handcuffs were removed, and he and Investigator Maupin spoke with Ms. Burgess for about ten minutes. [Doc. 74, p.82] After talking with Ms. Burgess, Investigator Butler walked through both levels of the house for a few minutes and then went back to the porch to talk to the Defendant. [Doc. 73, p.30; Doc. 74, p.83]

Investigator Butler testified that he interviewed the Defendant before the guns were found. [Doc. 74, p.84] He said he read the Defendant the Miranda rights, but he did not record the Defendant's statement because it is against DEA policy to record interviews. [Doc. 74, p.84] He did not have the Defendant sign a rights waiver because he had left the waiver form in the trunk of his car, even though he knew that he was going to talk to the Defendant that night. [Doc. 74, p.85, 88] Investigator Butler testified that although the Defendant was handcuffed for officer safety during his

statement, he was not under arrest. [Doc. 74, p.86]   He acknowledged that the Defendant was not free to leave. [Doc. 74, p.86]  He said that he did not go to the Defendant's house expecting to arrest him that evening, even though he expected to find firearms in the residence. [Doc. 74, p.90-92] Investigator Butler stated that if the guns had been found in the confidential defendant's bedroom, rather than on the main level of the residence, the Defendant might not have been arrested. [Doc. 74, p.92]

Investigator Butler testified that when he returned to the porch to talk with the Defendant, the other officers went inside, except for two officers standing ten to fifteen feet away. [Doc. 73, p.8] He told the Defendant that the officers were there to execute a search warrant. [Doc. 73, p.7] After the Defendant was advised of his <u>Miranda</u> rights, the Defendant gave verbal consent to search his residence and agreed that he was on parole for armed robbery. [Doc. 73, p.7]   The Defendant stated that he had been in the penitentiary for nine years. [Doc. 73, p.10] The Defendant said that he was a member of the Aryan Nation gang and that he became affiliated with the gang while in prison. [Doc. 73, p.11] Investigator Butler asked the Defendant if there were any weapons in the house, to which the Defendant replied that he had handled a Mossberg shotgun in the front yard and shot a .380 pistol in the side yard. [Doc. 73, p.11-12]   The Defendant responded that he believed the Mossberg shotgun and the .380 pistol were downstairs in the confidential defendant's residence. [Doc. 73, pp.13, 16]   The Defendant also said he believed there was a .357 somewhere in the residence. [Doc. 73, p.17]   Investigator Butler asked the Defendant where Ms. Burgess worked, and he replied that she worked at Bearden Pain Clinic. [Doc. 73, p.16] When Investigator Butler asked the Defendant about the armed robberies, the Defendant responded that given his past, he thought he needed a lawyer. [Doc. 73, p.17] At that point, Investigator Butler stopped the

interview and went inside to assist with the search. [Doc. 73, p.17]

Investigator Butler testified that approximately one hour after their arrival, when the officers had completed the search and were about to leave the residence, Officer Newman found the shotgun standing vertically in a four to five inch space behind the stove while conducting a "double check" of the residence. [Doc. 73, p.19-21, 24] Investigator Butler did not see any dust, dirt, or grime on the shotgun. [Doc. 73, p.21] At that time, the Defendant was seated on the couch. [Doc. 73, p.19] When the officers pulled the gun, wrapped in black sweatpants from behind the stove, the Defendant said, "Oh, those are my sweatpants." [Doc. 73, p.19] Investigator Butler did not recall any of the officers asking the Defendant a question before he made this statement. [Doc. 73, p.19-20] Investigator Butler testified that he would not personally store a shotgun shell behind a stove because he would be concerned about the heat. [Doc. 73, p.23] He stated that he observed no disfigurement from heat on either the shotgun or the shells. [Doc. 73, p.24] Investigator Butler testified that five to ten minutes before finding the shotgun, Officer Newman had also found the .380 pistol in the final sweep of the house. [Doc. 73, p.25, 27] The pistol was found on the main level of the house in a back bedroom in a drawer on a bed. [Doc. 73, p.27] The pistol was wrapped in a shirt and was not loaded. [Doc. 73, p.28-29] The officers had earlier found a round of ammunition to a .380 pistol downstairs in the confidential informant's room. [Doc. 73, p.26] The bullet was in plain sight on a shelf. [Doc. 73, p.31]

On redirect examination, Investigator Butler testified that after speaking with the confidential defendant on August 11, 2010, he immediately went to the LCPD and drafted the search warrant and supporting affidavit. [Doc. 73, p.34] Based upon the information from the confidential informant, he felt it was urgent to get the weapons off the street given the violent acts that were

12

occurring. [Doc. 73, p.35] In paragraph two of the affidavit, Investigator Butler stated that he set out

that the confidential informant had admitted participating in a robbery ring led by the Defendant and

had entered multiple addresses of pain clinic patients into a GPS unit. [Doc. 73, 36-37]

At the April 12 hearing, Investigator Butler identified the original copy [Exh. 14] of

the search warrant in this case, which was filed in the Loudon County General Sessions Court

Clerk's Office. [Doc. 75, pp.5-6] He had initially had problems retrieving the search warrant from

the clerk's office because it had been misfiled. [Doc. 75, pp.6-7] The search warrant reflects that

it was filed and the return made on August 13, 2010, at 4:22 p.m. [Doc. 75, p.7]

Sergeant Robert Scott Newman testified that he had worked for the City of Loudon

Police Department for around sixteen years. [Doc. 75, p.14] On August 12, 2010, Task Force Officer

Brandon Deboer contacted him and asked if he could provide marked police cars for the execution

of a search warrant at 535 River Road. [Doc. 75, p.14-15] Sergeant Newman stated that marked cars

were needed so that the occupants would know that the police were at the door, because guns were

thought to be in the house and because the warrant was to be executed in the early morning. [Doc.

75, p.15] He arrived at the residence at around 2:00 a.m., with a marked police car with the siren and

blue lights activated. [Doc. 75, p.15] Sergeant Newman remained at the residence for five minutes,

left to respond to a call on a domestic dispute for twenty to thirty minutes, and then returned to assist

with the search. [Doc. 75, p.16]

Sergeant Newman stated that upon his return to the house, he walked past Investigator

Butler and the Defendant engaged in a conversation on the front porch. [Doc. 75, p.16] He

overheard the Defendant say to Investigator Butler, "This is not my first time being in trouble with

you. I know my rights. It's not my first time being in trouble." [Doc. 75, p.16] The Defendant was

handcuffed and the tone of their conversation was civil. [Doc. 75, p.17] Sergeant Newman stated that he later saw the Defendant in the living room of the residence, seated on the couch. [Doc. 75, p.17] The Defendant was still handcuffed behind his back. [Doc. 75, p.17] The Defendant asked for a cigarette, and someone lit one and placed it in his mouth. [Doc. 75, p.18]

Sergeant Newman testified that he assisted with the search of the residence by checking behind the other officers areas previously searched. [Doc. 75, p.19] He found a .380 pistol and a twelve-gauge shotgun in the house. [Doc. 75, p.19] He located the pistol in a bedroom on the main level of the house. [Doc. 75, p.20] The pistol was in a drawer and wrapped in a cloth. [Doc. 75, p.21] He found the shotgun in the kitchen behind the stove. [Doc. 75, p.23] Upon seeing the shotgun, Sergeant Newman told Investigator Maupin that the shotgun was there and was wrapped in some jogging pants. [Doc. 75, p.26] The Defendant, who was sitting in the living room, which is open to the kitchen/dining room through a set of French doors, stated, "He even wrapped 'em up in my jogging pants." [Doc. 75, p.26] Sergeant Newman said that his comment about finding the shotgun was not directed to the Defendant, who was in the next room. [Doc. 75, p.26]

On cross-examination, Sergeant Newman stated that when the marked police car arrived at the Defendant's residence, the Task Force was already there but had not knocked on the door or made contact with the Defendant. [Doc. 75, p.28] He stated that there were a total of six or seven officers present, including himself and the officer driving the marked police car. [Doc. 75, p.28] After exiting his car, Sergeant Newman walked up the front steps onto the porch. [Doc. 75, p.29] The Defendant came out of the house and was handcuffed. [Doc. 75, p.29] Sergeant Newman did not see whether the Defendant was shown the search warrant before he exited the house. [Doc. 75, p.30] When Sergeant Newman entered the house, he saw Kristine Burgess standing in the living

14

room.  [Doc. 75, p.30] He then saw officers seat her at the dining room table.  [Doc. 75, p.30] A

thirteen- or fourteen-year-old boy came into the living room from his bedroom, which was not the

bedroom where the pistol was found.  [Doc. 75, p.32]  At that point, Sergeant Newman received a

call about a domestic violence incident and had to leave.  [Doc. 75, p.31-32]

Sergeant Newman testified that when he returned and saw the Defendant and

Investigator Butler on the front porch, he did not hear Investigator Butler advise the Defendant of

his Miranda rights.  [Doc. 75, p.34] Nor did he see the Defendant sign a rights waiver.  [Doc. 75,

p.34] Sergeant Newman participated in the search of the house, including the basement level.  [Doc.

75, p.38] He stated that the door to the basement level was open when he arrived the second time.

[Doc. 75, p.38-39]  The basement level consisted of two rooms, a large room with a bar in it and a

bedroom.  [Doc. 75, p.39] Sergeant Newman searched both of those rooms but did not find anything.

[Doc. 75, p.39] He later learned that a .380 shell had been found in the basement.  [Doc. 75, p.39]

After searching the basement, Sergeant Newman searched the main level.  [Doc. 75, p.40] He moved

the bed in order to open the drawer in which he found the pistol.  [Doc. 75, p.41] He found the

shotgun when he spotted a cloth in the gap between the stove and the cabinet.  [Doc. 75, p.47] The

shotgun was wrapped in dark-colored sweat pants.  [Doc. 75, p.52] Sergeant Newman testified that

he would not store shotgun shells behind a stove.  [Doc. 75, p.52] On redirect examination, Officer

Newman stated that it was unusual for him to find cloth behind a stove, so he touched the cloth and

felt the butt of the shotgun.  [Doc. 75, p.55]

Sergeant David Amburn testified that he works for the Knox County Sheriff's Office

and is assigned to the ATF Federal Task Force.  On October 21, 2010, Sergeant Amburn transported

the Defendant from the Loudon County Jail to his initial appearance at the federal courthouse.  [Doc.

75, p.57] He arrived at the jail around 9:30 a.m. [Doc. 75, p.58] He and Agent Steve Cordell identified themselves to the Defendant. [Doc. 75, p.58] He did not read the Defendant his <u>Miranda</u> rights, and he was not planning to question the Defendant because there was no witness with them in the vehicle, because Agent Cordell was behind him in a separate car. [Doc. 75, p.59] Sergeant Amburn transported the Defendant to the ATF office, because an ATF agent was accompanying the Defendant to the courthouse for his initial appearance. [Doc. 75, p.59]

Sergeant Amburn stated that they arrived at the ATF office around 10:00 a.m. [Doc. 75, p.60] Once he and the Defendant were joined by ATF Agent English, Sergeant Amburn read the <u>Miranda</u> rights to the Defendant. [Doc. 75, p.60] The Defendant then asked whether he had the right to stop answering questions at any time, and Sergeant Amburn confirmed that he did. [Doc. 75, p.60] Even though Sergeant Amburn did not plan to ask the Defendant any questions, he advised the Defendant of the <u>Miranda</u> rights because it is standard protocol. [Doc. 75, p.61] He did not ask the Defendant to sign a <u>Miranda</u> waiver form and did not ask him any questions that day. [Doc. 75, p.61] Around 11:00 a.m., he and Special Agent English transported the Defendant to federal court. [Doc. 75, p.61] While en route, the Defendant asked the agents what his charges were. [Doc. 75, p.62] Agent English told the Defendant that he had some local robbery charges, that he had a federal indictment, and that he would go over it further once he had a chance to look at the Defendant's file in the marshal's office. [Doc. 75, p.62] Agent English remained with the Defendant while he was processed and fingerprinted at the marshal's office, while Sergeant Amburn returned the car to the ATF office. [Doc. 75, p.63]

On cross-examination, Sergeant Amburn testified that he verbally advised the Defendant of his <u>Miranda</u> rights, even though he did not intend to ask any questions, so that there

would be no question that the Defendant had been informed of his rights, if he made any statements. [Doc. 75, p.64] He asked the Defendant if he understood these rights. [Doc. 75, p.65] Sergeant Amburn agreed that one interrogation technique is for officers to converse with each other in front of a defendant without asking him any questions. [Doc. 75, p.65] Sergeant Amburn stated that he did not overhear the Defendant make any statements against his own interest during the booking procedures at the ATF office. [Doc. 75, p.69] He stated that during the drive from the jail to the ATF office, the Defendant talked continuously, while he sat silently. [Doc. 75, p.69] Sergeant Amburn did not report anything the Defendant said during this drive, because he had not advised the Defendant of the Miranda warnings. [Doc. 75, p.69]

ATF Special Agent Lamar Marty English testified that he was assigned to transport the Defendant from the ATF office to the United States Marshal's office for a court appearance on October 21, 2010. [Doc. 75, p.72] He introduced himself to the Defendant and informed the Defendant that he is an ATF agent. [Doc. 75, p.72] Task Force Officer David Amburn read the Defendant the Miranda rights in Agent English's presence. [Doc. 75, p.72] At 11:15 a.m., Agent English and TFO Amburn transported the Defendant. [Doc. 75, p.73] During the five-block trip, the Defendant asked what his charges were. [Doc. 75, p.73] Agent English, who was not the case agent on this case, told the Defendant that he would review the Defendant's file and tell him then. [Doc. 75, p.73] Agent English did not ask the Defendant any questions during the drive. [Doc. 75, p.75] He accompanied the Defendant to the Marshal's office and remained with him until after his initial appearance. [Doc. 75, p.74] Upon reviewing the Defendant's file, Agent English told him that he was charged with being a felon in possession. [Doc. 75, p.75] At that point, the Defendant said that he knew guns were there and that the guns had been left by the guys that rented a room from him.

17

[Doc. 75, p.75]  The Defendant said that the guy was suppose to have removed the guns but had not done so.  [Doc. 75, p.75]  The Defendant paused and then said that does not change the fact that he knew the guns were there.  [Doc. 75, p.75] Agent English said that their tone was conversational and that a marshal was in and out of the room.  [Doc. 75, p.75] Agent English said that at no time, did he or any law enforcement officer ask the Defendant any question about his charges.  [Doc. 75, p.76] Instead, he repeatedly told the Defendant that he was not asking him any questions about this case, but the Defendant continued to talk.  [Doc. 75, p.76]

On cross-examination, Agent English agreed that his time with the Defendant on October 21, 2010, was short.  [Doc. 75, p.76] Before traveling to the courthouse, TFO Amburn recited the Miranda rights to the Defendant from memory but did not ask the Defendant to sign a waiver.  [Doc. 75, pp.78] The Defendant said that he understood his rights and asked a question relating to his ability to stop answering questions.  [Doc. 75, p.78]  TFO Amburn told the Defendant that he could stop answering questions and that it would not be held against him.  [Doc. 75, p.79] Agent English agreed that if a defendant started talking about his crime, English would not stop him. [Doc. 75, p.80]

Agent English testified that once he and the Defendant were seated in the Marshal's office, he reviewed the Defendant's file and told him that he was charged with felon in possession. [Doc. 75, p.81]  Agent English stated that in his experience, most people, when informed of their charges, remain silent.  [Doc. 75, p.82]  Agent English stated that he was "extremely surprised" when the Defendant responded in the way that he did.  [Doc. 75, p.83] The Defendant responded by saying, "I knew the guns were there."  [Doc. 75, p.83] Although Agent English did not ask any further questions, the Defendant stated that the guns were left by the guy who is renting space from

18

him. [Doc. 75, p.84] The Defendant said that the guy was suppose to have removed the guns before the time of the search warrant but that the guy got arrested or went to jail. [Doc. 75, p.85] Then, the Defendant said, "But that doesn't change the fact that I knew they were there." [Doc. 75, p.86] During the hour before the initial appearance, Agent English and the Defendant had other conversations besides the one regarding the Defendant's charges. [Doc. 75, p.77] The Defendant told him that his nickname was "Joker" and they laughed a lot. [Doc. 75, p.77] During this time, the Defendant was handcuffed and shackled. [Doc. 75, p.81]

At the April 12 hearing, the Defendant testified on his own behalf as follows: Around 1:30 or 2:00 a.m., on August 12, 2010, he was asleep in the residence he shares with Kristine Burgess and her fourteen-year-old son, when he was awakened by bright lights and the sound of a steel object banging on the door. [Doc. 75, pp.90-92] He had been asleep for roughly two hours at this point and had consumed alcohol before going to bed, so he was groggy. [Doc. 75, p.92] The Defendant answered the door, clad only in boxer shorts, and saw officers with guns drawn and pointed at him through a wooden lattice. [Doc. 75, pp.91-92] Two officers, one of whom may have been Investigator Butler, were on the front porch. [Doc. 75, p.92] The officer holding the metal [Doc. 75, p.93] implement moved to the side and the armed officers told the Defendant not to move. [Doc. 75, p.93] The officers said they had a search warrant, but they did not show it to the Defendant. [Doc. 75, p.95] Investigator Butler asked if he was Jason Melton, and the Defendant said, "Yes[.]" Then, Investigator Butler handcuffed the Defendant behind his back, Butler and the Defendant sat down on the porch, and the rest of the officers entered the house. [Doc. 75, p.93] Three to four minutes later, the Defendant saw Kristine Burgess kneeling, handcuffed, in the front room of the house. [Doc. 75, p.49-95]

19

The Defendant testified that Investigator Butler remained on the front porch with him for fifteen to twenty minutes. [Doc. 75, p.95] Investigator Butler told him that he was not under arrest and was handcuffed for his own safety and that of the officers and read him the Miranda warnings from a clipboard. [Doc. 75, pp.95-96] Investigator Butler asked the Defendant if he understood his rights, and the Defendant said, "Yes." [Doc. 75, p.96] Investigator Butler asked if the Defendant would like to have an attorney present during questioning, and the Defendant replied, "Well, yeah, I would, if you don't mind." [Doc. 75, p.96] Investigator Butler then told the Defendant that he had been watching him for a long time and started talking about something else. [Doc. 75, p.96] Investigator Butler asked him where Kristine Burgess worked. [[Doc. 75, p.106] Investigator Butler moved the Defendant's handcuffs to the front, so the Defendant could sign a paper, then moved them behind him again. [Doc. 75, p.97] The Defendant said that both he and Investigator Butler signed a sheet stating the Defendant's rights and saying that he wanted an attorney but that this document was never provided to him in discovery. [Doc. 75, pp.98-99] Investigator Butler then commented that the Defendant had an opportunity to help himself. [Doc. 75, p.97] The Defendant testified that he chose not to talk to Investigator Butler and did not make any statements about handling or firing weapons. [Doc. 75, p.98] The Defendant stated that he only made two requests of Investigator Butler: He told Butler that he wanted an attorney present and he asked to go inside because it was raining, and he was cold. [Doc. 75, p.98]

The Defendant denied ever waiving his Miranda rights or giving verbal consent to search the residence. [Doc. 75, p.103] He stated that he never told Investigator Butler that he had been in prison or that he was a member of the Aryan Nation. [Doc. 75, p.104]

The Defendant stated that once he signed the acknowledgment of his rights,

20

Investigator Butler stopped talking to him and moved him inside to the couch.  [Doc. 75, p.100] The Defendant was permitted to smoke and, eventually, to put on a shirt and pajama pants, although he remained handcuffed behind his back.  [Doc. 75, pp.100-01]  As the officers were searching the house, the Defendant heard one officer exclaim, "I found it.  I found one, found it," from the back bedroom.  [Doc. 75, p.101] The Defendant testified that he did not wrap a pistol in a shirt and hide it in the back bedroom.  [Doc. 75, p.103] He stated that he did not possess a pistol at the residence. [Doc. 75, p.103]  At one point, an officer asked him if he was on parole, and the Defendant told him that he was.  [Doc. 75, p.104] The Defendant testified that during the search, some of the officers were talking about him shooting a gun in the yard.  [Doc. 75, p.105] The Defendant said that he told them the only gun he had shot in his front yard was a pellet gun to scare the birds away from his freshly washed car.  [Doc. 75, p.105] The Defendant testified that when he saw the shotgun wrapped in sweatpants, he said something like, "He even put them in my sweatpants," because at that point, he began to realize that this was related to Bobby Wright.  [Doc. 75, p.107] The Defendant denied hiding the shotgun behind the stove.  [Doc. 75, p.114]

The Defendant testified that Bobby Wright and his girlfriend Holly Carr lived in the downstairs part of the residence from April to August 2010.  [Doc. 75, p.107-08] When Bobby Wright move in, the Defendant saw the butt of a gun protruding from a duffle bag. [Doc. 75, p.109] The Defendant told Wright that he could not have guns, other than pellet guns, at the residence because the Defendant was on parole.  [Doc. 75, p.109] The Defendant informed Wright that his parole officer could search the house at any time.  [Doc. 75, p.109] Wright objected to removing the guns, saying that he had the right to defend himself in his part of the residence and reminding the Defendant that he had agreed that the Defendant would not come downstairs when Wright and his

21

girlfriend were there. [Doc. 75, p.109] The Defendant asked Wright to remove the gun, at least until he could ask his parole officer about the issue. [Doc. 75, p.109-10] Wright agreed to move the gun to his girlfriend's mother's house that night. [Doc. 75, p.110] He said he never saw Wright with the guns in the main level of the house. [Doc. 75, p.111]

The Defendant stated that the downstairs was a separate residence with a kitchen, bathroom, and living room. [Doc. 75, p.110] He stated that the downstairs had a separate entrance from the outside. [Doc. 75, p.110] He said that his and Ms. Burgess's washer and dryer were downstairs, because there was nowhere to connect them upstairs. [Doc. 75, p.110] The Defendant said that Wright asked them to knock before coming down to use the washer and dryer. [Doc. 75, p.111] Wright sublet the downstairs from Ms. Burgess. [Doc. 75, p.11]

The Defendant testified that on October 21, 2010, he was transported to federal court by two ATF agents. [Doc. 75, p.114] The Defendant said that the agents did not give him the Miranda warnings. [Doc. 75, p.114] He said that Agent Amburn transported him from the Loudon County Jail to federal custody. [Doc. 75, p.114] Agent Amburn did not advise him of the Miranda warnings. [Doc. 75, p.115] Once he was at the federal courthouse, the Defendant was with Agent English, and a marshal was in and out of the room. [Doc. 75, p.116] Agent English also did not advise him of the Miranda warnings. [Doc. 75, p.120] The Defendant said that after looking at his file, Agent English answered the Defendant's question about what his charges were, telling him that he was charged with being a felon in possession of firearms. [Doc. 75, p.116] The Defendant agreed that after Agent English informed him of the charge, he said that he knew there were guns at the house but Wright was suppose to remove them. [Doc. 75, p.117] The Defendant did not recall saying that Wright was suppose to have removed the guns before the search warrant but was arrested

22

or that it did not change the fact that he knew the guns were there. [Doc. 75, p.118] The Defendant said that no one gave him the Miranda warnings that day.

On cross-examination, the Defendant stated that at the time of the search, he was thirty-one years old, had obtained a GED, and was enrolled in college. [Doc. 75, p.121] The Defendant acknowledged that he had felony convictions for burglary, aggravated burglary, theft over $1,000, and escape. [Doc. 75, p.122-23] The Defendant agreed that on August 12, 2010, Investigator Butler read him the Miranda rights, did not yell at him, and did not have his gun drawn at that time. [Doc. 75, p.123] The Defendant stated that the remainder of Investigator Butler's report was false, because he never said that Ms. Burgess worked at Bearden Pain Clinic, that he had spent nine years in prison, that he was in the Aryan Nation, that he had held a sawed-off shotgun in his front yard, or that he had shot a .380 pistol with a broken handle. [Doc. 75, p.124] He stated that both Investigator Butler and Sergeant Newman had falsely testified that he made statements on the porch. [Doc. 75, p.129] The Defendant stated that he did not know that Investigator Butler was investigating a armed robbery ring or that he was or is currently a suspect in an armed robbery case. [Doc. 75, p.124-25]

The Defendant testified that the sweatpants in which the shotgun was wrapped are his. [Doc. 75, p.129] He said that the only washer and dryer in the residence were located downstairs. [Doc. 75, p.129] He agreed that the residents of the home could freely travel from the main level to the basement level. [Doc. 75, p.129] The Defendant stated that other items, in addition to the two firearms, seized in the execution of the search warrant were planted in the main level of the residence. [Doc. 75, p.132-33]

The Defendant stated that TFO Amburn and Agent English falsely testified that

23

Amburn read the Miranda rights to him on October 21, 2010. [Doc. 75, p.131] He stated that Agent English "mis-remembered" what the Defendant said in the Marshal's office. [Doc. 75, p.132] On redirect examination, the Defendant testified that he told Agent English that he knew the guns were there when Wright first came to the residence, he told Wright to remove the guns, and that Wright was suppose to have removed the guns but he was arrested. [Doc. 75, pp.134-35]

On April 18, 2011, the Defendant filed a *pro se* letter [Doc. 72 & Exh. 19] with the Court, stating that he may have been wrong in denying that anyone had read him the Miranda warnings on October 21, 2010. In the letter, the Defendant states that he may have had an epileptic seizure, caused by a flashing light on a fire alarm. He contends that during that seizure, he felt like he was in a dream. He states that he may not have realized if the agents informed him of his rights within a certain time after the fire alarm. The Court ordered [Doc. 76] that the suppression hearing be reopened to permit the parties to present any additional evidence relating to matters raised in the Defendant's *pro se* letter.

The parties reconvened on May 3, 2011, and the Defendant testified as follows: The Defendant was diagnosed with juvenile epilepsy when he was fourteen or fifteen years old. [Doc. 82, p.6] His last seizure, prior to October 2010, was when he was twenty years old. [Doc. 82, p.7] The Defendant has not taken medication for epilepsy since age twenty-one or twenty-two. [Doc. 82, p.7] The Defendant stated that when he had a seizure in the past, he first felt as though his head was floating and his throat felt tight. [Doc. 82, p.7] He stated that he felt sick, and then he would black out. [Doc. 82, p.8] When he regained consciousness, he would have bitten his tongue or the inside of his mouth and his face would feel "like pins and needles." [Doc. 82, p.8] The Defendant testified that during a prior seizure induced by flashing lights, he had head-butted a wall. [Doc. 82, p.11] The

24

Defendant said he knew when he had a seizure, although he did not always remember what occurred during the seizure. [Doc. 82, p.12] He stated that he did not have a seizure on the night the search warrant was executed. [Doc. 82, p.12]

The Defendant stated that on October 21, 2010, the Defendant felt like he was beginning to have a seizure from the flashing lights. [Doc. 82, p.9] He was seated across from an open door, through which was a fire alarm, about ten to twelve feet away from him, with a flashing light. [Doc. 82, p.15, 18] Agent English was sitting at the end of the table, reading a file. [Doc. 82, p.17] The Defendant said that at first he did not think the alarm would affect him, because he believed he had outgrown the seizures, but then his throat tightened and his head began to swim. [Doc. 82, pp.10, 18] The Defendant placed his hand over his eyes to block out the flashing lights. [Doc. 82, p.8] The seizure began shortly after the fire alarm went off, and the Defendant did not know how long it lasted. [Doc. 82, p.15] The Defendant said that during the seizure, he was "going in and out," and he remembered one of the officers asking if he was ok. [Doc. 82, pp.15, 19] The Defendant stated that Agents Amburn and English may have read him the <u>Miranda</u> rights right after the fire alarm. [Doc. 82, p.13] He did not know how long the seizure lasted, but when his head cleared, TFO Amburn was explaining that he was going to take a DNA swab. [Doc. 82, p.19]

The Defendant testified that he wrote the letter to the Court without consulting his attorney, because he wanted to tell the truth. [Doc. 82, p.20] He stated that he had forgotten about the fire alarm, when he testified at the prior hearing, and had not considered that he may have had a seizure. [Doc. 82, p.22] After the earlier hearing, when he was thinking about why the agents testified that they had read the <u>Miranda</u> warnings to him, he realized that he did not remember a span of time following the fire alarm when he was trying to keep from having a seizure. [Doc. 82, p.23]

25

The Defendant said that he was not sure whether he actually had a seizure during that time. [Doc. 82, p.24]

The Government recalled KCSO Sergeant David Amburn. [Doc. 82, p.24] He reiterated that on October 21, 2010, he transported the Defendant from the Louden County Jail to the ATF office. [Doc. 82, p.25-26] When he picked up the Defendant, the jail did not inform him that the Defendant had a medical condition or that he had ever acted erratically. [Doc. 82, p.25] Once at the ATF office, he, the Defendant, and Special Agent English sat in the break room. [Doc. 82, p.26] Sergeant Amburn sat across the table from the Defendant. [Doc. 82, p.26] The Defendant was conversing clearly with them, and his speech was not slurred. [Doc. 82, p.28] While they were sitting in the break room that morning, the fire alarm went off. [Doc. 82, p.26-27] The alarm, a three-inch-by-four-inch box with an audio tone and a strobe light, was on for less than a minute. [Doc. 82, p.27] Sergeant Amburn agreed that the alarm was loud. [Doc. 82, p.27]

Sergeant Amburn stated that during the fire alarm, the Defendant sat across from him and looked at him.[Doc. 82, p.28] Agent Cordell came almost immediately and told them that they did not need to evacuate. [Doc. 82, p.27] Sergeant Amburn and the Defendant engaged in "lighthearted conversation" and commented that fire alarms are annoying. [Doc. 82, p.28] Sergeant Amburn denied seeing the Defendant cover his eyes, hold his throat or head, or engage in any abnormal behavior. [Doc. 82, p.29] The Defendant was responsive immediately after the alarm and did not act any differently than before the alarm. [Doc. 82, p.29-30] Sergeant Amburn stated that he did not ask the Defendant if he was ok, because he saw no reason to question the way the Defendant was feeling. Shortly thereafter, Sergeant Amburn and Agent English took the Defendant to the transport vehicle, and the Defendant had no problems walking and talking. [Doc. 82, pp.30-

26

31]  On cross-examination, Sergeant Amburn testified that prior to coming to the hearing, he had read the letter the Defendant sent to the Court. [Doc. 82, p.31]

The Government also recalled ATF Special Agent Lamar English.  [Doc. 82, p.32] On October 21, 2010, Agent English was assigned to transport the Defendant from the ATF office to the Marshal's Service.  [Doc. 82, p.33] Agent English saw the Defendant and Sergeant Amburn in the break room talking and Agent Amburn writing something down.  [Doc. 82, p.33-34] Agent English was in and out of the break room that morning, and the Defendant was conversing normally and did not appear to be acting erratically or incoherently.  [Doc. 82, p.34, 36] While Agent English was in the break room, a fire alarm went off.  [Doc. 82, p.35] Agent English described the fire alarm as a four-inch-by-five-inch box with a strobe light and a speaker and located on the wall about eight feet from the ground.  [Doc. 82, p.35] It alarmed, flashing and making an obnoxiously loud noise, for forty-five seconds to one minute.  [Doc. 82, p.35]

Agent English testified that they did not evacuate because Agent Cordell came as soon as the alarm went off and told them that it was a test or a malfunction.  [Doc. 82, p.35]  Agent English did not recall the Defendant making any movements during the fire alarm, such as covering his eyes or holding his throat.  [Doc. 82, p.36] After the fire alarm, the Defendant spoke and acted the same as before the fire alarm.  [Doc. 82, p.36-37] The Defendant did not express any medical concerns to him and was able to walk to the transport vehicle.  [Doc. 82, p.37] He did not ask the Defendant if he was ok after the fire alarm sounded, because nothing indicated that there was anything wrong with the Defendant.  [Doc. 82, p.37] Nothing about the Defendant's behavior that morning caused Agent English to believe that the Defendant had a seizure.  [Doc. 82, p.38]

On cross-examination, Agent English stated that he had never seen the Defendant

27

walk or heard him speak before the morning of October 21, 2010. [Doc. 82, p.38] During that day, Agent English spent no more than two and one-half to three hours with the Defendant, and Agent English also performed other duties during that time. [Doc. 82, p.39] He acknowledged that he was not aware of the Defendant's psychological background. [Doc. 82, p.39] Agent English had read and discussed the Defendant's letter to the Court prior to the hearing. [Doc. 82, p.40]

On recross examination, Agent English testified that he did not review the file on the Defendant until he and the Defendant were at the Marshal's office awaiting the initial appearance. [Doc. 82, p.41] Agent English was with the Defendant the entire one and one-half hours that the Defendant was at the Marshal's lockup. [Doc. 82, p.41] He and the Defendant conversed, and the Defendant seemed more relaxed and joked more than he had at the ATF office. [Doc. 82, p.41] Agent English noticed no difference in the Defendant's manner of speaking, clarity, or responsiveness. On recross-examination, Agent English stated that he did not introduce himself to the Defendant until after the fire alarm when they were walking out of the building. [Doc. 82, p.42] He stated that he had observed the Defendant talking with Sergeant Amburn before that. [Doc. 82, p.42]

### III. FINDINGS OF FACT

The Court makes the following factual findings about the search of the River Road residence and the Defendant's statements:

At 1:15 a.m., on August 12, 2010, Loudon County Commissioner Cissy Chapman issued a search warrant for a home at 535 River Road, Loudon, Tennessee, based upon the affidavit of Lenoir City Police Department Investigator Jason Butler. Investigator Butler and a team of

approximately ten officers executed the search warrant around 2:00 a.m. that same morning. At least one marked police unit, with lights and siren activated, accompanied the search team to the residence. Investigator Butler knocked on the door, which was answered by the Defendant Jason Jennings Melton. The Defendant, who had been awakened from sleep, was clad only in boxer shorts. Upon identifying the Defendant, he was moved to the front porch and handcuffed behind his back. Investigator Butler and the search team then entered the home. While other officers began the search, Investigator Butler asked the Defendant's girlfriend Kristine Burgess, who had also been handcuffed, to be seated at the dining room table. Ms. Burgess's handcuffs were removed, and Investigators Butler and Maupin talked with her for approximately ten minutes. Investigator Butler then walked through the main and basement levels of the house.

While the search was underway, Investigator Butler returned to the front porch to speak with the Defendant. He began reading the <u>Miranda</u> warnings to the Defendant, who interrupted him to say that he understood his rights because he had been through the system before. Investigator Butler repeated the entire <u>Miranda</u> litany to the Defendant. After reading the Defendant his rights, Investigator Butler asked if the Defendant wanted to speak to him. The Defendant acknowledged that he understood his rights and began speaking. The Defendant told Investigator Butler that had served nine years in prison and was presently on parole. The Defendant said he was a member of the Aryan Nation gang, which he had joined while in prison. The Defendant gave his consent to search the house. Investigator Butler asked if there were any guns in the house, and the Defendant responded that he believed there was a .380 pistol and a Mossberg shotgun downstairs in the residence of Bobby Wright. The Defendant stated that he had handled the Mossberg shotgun in his front yard and had shot the .380 pistol, which has a broken handle, in his side yard. The

29

Defendant also said he believed there was a .357 somewhere in the residence. Investigator Butler asked the Defendant where Ms. Burgess worked, and he said that she worked at Bearden Pain Clinic. When Investigator Butler asked the Defendant about some robberies that had occurred in Knox County, the Defendant asked to speak to a lawyer due to his criminal history. Investigator Butler stopped the interview, moved the Defendant inside to a couch in the living room, and gave him a cigarette that he had requested. During this entire time, the Defendant remained handcuffed behind his back.

During the search of the basement level of the house, officers found a .380 bullet on a shelf. Sergeant Robert Scott Newman, of the City of Loudon Police Department, was a member of the search team that morning. As the search was winding down, Sergeant Newman began checking areas that other officers had already searched. Sergeant Newman found a .380 pistol with a broken handle in a drawer on a bed in a back bedroom on the main level of the home. The pistol was wrapped in a shirt. Shortly thereafter, and about one hour after the search commenced, Sergeant Newman was searching in the kitchen on the main level of the home, when he spotted a cloth through a gap between a cabinet and the stove. Sergeant Newman reached behind the stove and removed a shotgun wrapped in a pair of dark-colored sweatpants. The shotgun was a sawed-off Mossberg with five rounds of ammunition attached to the stock.

When Sergeant Newman spotted the shotgun, he told Investigator Maupin that it was there and was wrapped in some sweatpants. The Defendant, who was seated in the living room, which is open to the dining room and kitchen through a pair of French doors, said, "He even wrapped 'em up in my jogging pants." No officer ask the Defendant a question prior to that exclamation. When the search was completed, Investigator Butler made an inventory of the items seized and left

a copy of the search warrant with Ms. Burgess.

On October 21, 2010, Sergeant David Amburn of the Knox County Sheriff's Office (KCSO) Sergeant and ATF Task Force Officer, transported the Defendant from the Loudon County Jail to the ATF office in Knoxville. Sergeant Amburn did not ask the Defendant any questions during the trip. Upon arrival at the ATF office, Sergeant Amburn waited with the Defendant in the break room. ATF Special Agent Lamar English was in and out of the break room during this time. In the presence of Agent English, Sergeant Amburn advised the Defendant of the <u>Miranda</u> warnings. The Defendant asked if he had the right to stop answering questions at any time, and Sergeant Amburn said that he did. At some point, during the morning, the fire alarm, which was located on the wall outside the break room and which had a strobe light in addition to a siren, went off for about sixty seconds. Agent English and Sergeant Amburn were informed that it was a false alarm and remained in the break room with the Defendant. They did not notice the Defendant behave in an unusual fashion during or after the alarm.

Around 11:00 a.m., Sergeant Amburn and Agent English transported the Defendant from the ATF office five blocks to the United States Marshal's Service office, where he was to be processed for an initial appearance in federal court. Agent English, who had only been around the Defendant intermittently prior to this, introduced himself to the Defendant and told the Defendant that he is an ATF agent. During the short drive, the Defendant asked the officers what his charges were. Agent English told the Defendant that he did not know the Defendant's charges but that he would let the Defendant know once they reached the Marshal's office and he could review the Defendant's file. Sergeant Amburn dropped Agent English and the Defendant off at the Marshal's Service sally port and then returned the car to the ATF office. Agent English remained with the

31

Defendant while he was processed at the Marshal's office and accompanied him to his initial appearance.

Once at the Marshal's office, Agent English reviewed the Defendant's file and told the Defendant that he was charged with being a felon in possession of a firearm. The Defendant stated that he knew the guns were at his house and that the guns had been left there by the individual who rented a room from him. The Defendant said that the individual was suppose to have removed the guns but had been arrested and not done so. The Defendant said that this did not change the fact that he knew the guns were there.

Any other factual findings will be made as a part of the Analysis below.


## IV.  ANALYSIS

The Defendant calls for the suppression of evidence seized during the August 12, 2010 search of his home and of statements he made to law enforcement officers on August 12 and October 21, 2010. The Court will examine each of these issues in turn.


### A.  Propriety of August 12, 2010 Search of Defendant's Residence

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In the early morning hours of August 12, 2010, law enforcement officers searched the Defendant's residence pursuant to a search warrant. The Defendant contends that his rights under the Fourth

32

Amendment were violated by both the issuance and the execution of that search warrant. The Defendant contends that the search warrant is invalid because it is not sufficiently particular with regard to the place to be searched. He also argues that Commissioner Chapman lacked probable cause to issue the search warrant because (1) the affidavit fails to show any nexus between the place to be searched and the criminal activity alleged, (2) the affidavit fails to demonstrate that the confidential informant was reliable, (3) the information from the confidential informant is stale, and (4) the affidavit contains false information. The Defendant faults the execution of the search warrant because (1) the search was not limited to his residence, (2) officers seized items not within the scope of the search warrant, and (3) the time of execution was not noted on the face of the search warrant.

*(1) Particularity*

The Defendant argues that the evidence seized pursuant to the search warrant should be suppressed because the description of the place to be searched was not sufficiently particular to permit the executing officers to search the correct residence with reasonable effort. He contends that the River Road residence has separate living quarters on the main level and in the basement level. He asserts that he lives on the main level of the house, and the search warrant should have restricted the search thereto. The Government responds that the search warrant accurately described the River Road house and that the search warrant was reasonably particular because the Defendant had access to the entire house. Alternatively, the Government argues that if the search warrant should have restricted the search to the main level of the house, the two firearms and the attached ammunition were found on the main level and, therefore, should not be suppressed.

The Fourth Amendment requires that search warrants describe the place to be

searched with particularity.  U.S. Const. amend. IV.  A warrant satisfies this requirement "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503 (1925).  The particularity requirement does not turn upon the description in the warrant being "'technically accurate in every detail.'" United States v. Pelayo-Landero, 285 F.3d 491, 496 (6th Cir. 2001) (quoting United States v. Prout, 526 F.2d 380, 387-88 (5th Cir. 1976)).  Instead, the test for determining whether a warrant is sufficiently particular contains two prongs: "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." United States v. Gahagan, 865 F.2d 1490, 1497 (6th Cir.), cert. denied, 492 U.S. 918 (1989).

        The present search warrant gives the following description of the property to be searched:

> Large white two story single family dwelling with a brick garage and a white garage door on the front right side of the residence.  This residence sits on[ ]top of a large hill directly across from Rivers Edge subdivision.  This residence is one house east of 543 River Road.

[Exh. 1][4]  The affidavit supporting the search warrant states [Exh.1, ¶2] that the confidential informant related that the Defendant lives at the River Road residence with his girlfriend Kristine Burgess.  The affidavit also relates that the confidential informant said "he lived in the lower part of the target residence and was able to describe in detail the description of the house, which the

_____

        [4]Although the affidavit is written in all capital letters, the Court quotes from the affidavit using upper and lower case letters to make the quoted passages more readable.

officers verified through independent investigation." [Exh.1, ¶3]

At the evidentiary hearings, Investigator Butler testified that the confidential informant told him that he lived on the downstairs floor of Jason Melton and Kristine Burgess's residence. Investigator Butler stated that during the search of the residence, he was able to access the basement level from an interior stairway, which he entered through an unlocked door in the hallway of the main level. On cross-examination, Investigator Butler said that both levels of the house had an entrance from the exterior, a kitchen, a living area, a bedroom or bedrooms, and a bathroom. The Defendant testified that the River Road residence belonged to Kristine Burgess. He stated that from April to August 2010, Ms. Burgess sublet the downstairs floor to Bobby Wright and Holly Carr. The Defendant testified that the downstairs was a separate residence but that the only washer and dryer were located downstairs, because there was no place to connect them on the main level. The Defendant testified that Wright asked them to knock before coming downstairs to use the washer and dryer, when he or his girlfriend were there. On cross-examination, the Defendant agreed that the residents could freely travel from the main level to the basement level.

In the present case, the Defendant does not argue that the officers could not reasonably find the River Road house based upon the description in the search warrant. Instead, he argues that the house contained two residences and the description in the search warrant was not sufficiently narrow because it did not restrict the executing officers to the residence on the main level of the house. "'For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses.'" United States v. Votteller, 544 F.2d 1355, 1363 (6th Cir. 1976) (quoting United States v. Hinton, 219 F.2d 324, 325–26 (7th Cir. 1955)); see also United States v. Shamaeizadeh, 80 F.3d 1131, 1137 (6th Cir.

35

1996). In such circumstances, "'when the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched.'" Shameizadeh, 80 F.3d at 1137 (quoting United States v. Whitney, 633 F.2d 902, 907 (9th Cir.), cert. denied, 450 U.S. 1004 (1981)). The Court evaluates whether an officer seeking a search warrant should have known that a building is divided into multiple dwellings based upon "the information available to [the officer] at the time [he or she] acted" to obtain the warrant. Maryland v. Garrison, 480 U.S. 79, 85 (1987); United States v. Noel, 938 F.2d 685, 687 (6th Cir. 1001). "The validity of the warrant must be assessed on the basis of the information the officers disclosed, or had a duty to discover and to disclose, to the issuing magistrate." Garrison, 480 U.S. at 85; Noel, 938 F.2d at 687. Thus, "a search warrant inaccurately identifying the situs of the search will, nevertheless, be upheld against a particularity challenge if the warrant faithfully described the structure as it was known or should have been known to the officers after reasonable inquiry." Noel, 938 F.2d at 687.

In Noel, the officers executed a search warrant for a single family dwelling and, during the execution of the warrant, learned that the home had been subdivided into three residences. 938 F.2d at 686. The defendant argued that the search warrant was not sufficiently particular to comport with the Fourth Amendment. Id. at 687. The appellate court concluded that the officer, who suspected that the home could contain more than one residence, had reasonably inquired into the "configuration of the structure[.]" Id. The officer in that case had checked with other officers who had previously executed warrants at the house, checked the telephone directory, and checked with the utility company. Id. "Finally, the evidence demonstrated that there existed no outward indications that the buildings on the parcel had been divided into three units." Id.

In the instant case, the Court questions whether the River Road house contained two

36

residences. Although the Defendant testified that the main level and basement level of the house were separate residences, he also testified that the basement level contained the only laundry facilities in the house and that the residents of both levels traveled freely between the levels. Nevertheless, even assuming there were two residences, the Court finds nothing that would have put Investigator Butler on notice that the River Road house contained two dwellings. The house was a single family dwelling, not an apartment building, a duplex, or a townhouse. The affidavit states [Exh. 1, ¶3] that the officers verified the confidential informant's description of the residence. The record is devoid of evidence that the residence had two mailboxes, driveways, or other physical indication that it contained two residences. The confidential informant's statement to Investigator Butler that he lived in the downstairs portion of the residence did not indicate that the informant was renting a separate residence, rather than staying as Ms. Burgess and the Defendant's guest. Although Investigator Butler did not state in the affidavit that he checked with the utility company or in the telephone book,[5] the Court finds that Investigator Butler's investigation into the configuration of the residence was reasonable, given that he had no reason to suspect that it was two separate dwellings and his need to act quickly in light of the perceived danger. Accordingly, the Court finds that the description of the residence to be searched in the search warrant was sufficiently particular to allow the executing officers to identify the location to be searched.

Moreover, even if the River Road residence contained two occupancy units, the Court finds that probable cause existed to search them both. The affidavit in support of the search warrant states that the confidential informant lived in the lower part of the residence [Exh. 1, ¶3], was a

---

[5]Given the prevalence of individuals who have only a cellular telephone, the Court suspects that the telephone directory of land lines is not as reliable an indicator as it was some twenty years ago when the appellate court decided Noel.

member of a robbery ring led by the Defendant [Exh. 1, ¶2], and has used his Garmin GPS unit in locating the homes of robbery victims [Exh. 1, ¶2]. The affidavit also states that the Defendant keeps a red duffle bag containing the Garmin GPS unit at the residence [Exh. 1, ¶3]. The Court finds that these statements provide probable cause to believe that an instrumentality of the robberies, the GPS unit, would be found in the lower level of the residence where the confidential informant stayed.

Finally, in the event that the District Court disagrees that the search warrant is sufficiently particular, the Court observes that the only item seized from the basement level of the residence was a single .380 bullet. If the District Court concludes that the search warrant should have restricted the search of the residence to the main level of the River Road house, then the Court recommends that only that .380 bullet be suppressed.

*(2) Probable Cause*

The Defendant also contends that the affidavit supporting the issuance of the search warrant fails to provide probable cause for the warrant to issue. He states that probable cause is lacking for four reasons: (1) the affidavit fails to show a nexus between the River Road house and criminal activity, (2) the affidavit contains no information that would permit the commissioner to conclude that the confidential informant is reliable, (3) the information from the confidential informant is stale, and (4) the affidavit contains false information.[6] The Government argues that the

---

[6]In his motion, the Defendant also makes the unsupported assertion that the "magistrate had no authority to issue the search warrant." [Doc. 25, p.1] In his reply, he expounds upon his original contention, stating that "Judicial Commissioner Cissy Chapman may have had legal authority to issue the warrant, but she was precluded from doing so without a proper finding of probable cause." [Doc. 59, p.10] Accordingly, the Court takes this argument to be subsumed

affidavit provides probable cause and that alternatively, if probable cause is lacking, the officers searched the home in good faith reliance on the search warrant.

As set out above, the Fourth Amendment requires probable cause for the issuance of a search warrant. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, . . . (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The issuing authority's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. "The task of the issuing magistrate is simply to make a practical,

---

within the Defendant's arguments that the search warrant affidavit does not provide probable cause.

common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39. In making this determination, the Court considers only the information that was before the issuing judge–in other words, only what is contained within the four corners of the supporting affidavit. United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971).


*(i) Nexus*

The Defendant argues that the search warrant affidavit fails to provide a nexus between his River Road residence and any criminal activity. An affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." United States v. Hawkins, 278 F. App'x 629, 634 (6th Cir.), cert. denied 129 S. Ct. 588 (2008); see also United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004).

In the present case, the affidavit reveals [Exh. 1, ¶5] that the confidential informant saw the Defendant brandish a Mossberg 500 shotgun with a wooden stock and pump at the River Road residence. Moreover, the confidential informant, who lived in the residence with the Defendant, states that the Defendant keeps evidence and instrumentalities of the robberies in the house, to wit the medical records of robbery victims, a Garmin GPS unit, and a polymer club used in a prior robbery and beating. Accordingly, the Court finds that the affidavit provides probable

40

cause to believe that evidence of criminal activity would be found at the River Road house. The Defendant argues that the confidential informant's claims that he was involved with a robbery ring and that the fruits and instrumentalities of that enterprise were kept at the house are "nothing more than uncorroborated, third party hearsay." [Doc. 59, p.11] The Court will address the reliability of the confidential informant in the next section.

*(ii) Reliability of Confidential Informant*

The Defendant argues that Investigator Butler's affidavit contains no facts from which Commissioner Chapman could determine that the information from the confidential informant is reliable. The Defendant contends that the affidavit does not state that the confidential informant had provided accurate information in the past, nor does it involve the informant giving information against his own penal interest, because the informant was a witness rather than a participant in the robbery described. Additionally, the Defendant asserts that the affidavit contains no information that the police corroborated anything other than minimal innocent and commonly-known details–identification of the car driven by Ms. Burgess, the description of the house, and the identification of the Defendant from a photograph–provided by the informant. The Government responds that the affidavit reveals that the confidential informant provided detailed information, that law enforcement corroborated specific details provided by the confidential informant, and that the informant made a statement against his own penal interest.

Probable cause for the issuance of a search warrant may be gleaned from information provided by a confidential source but, in such cases, the issuing judge must have a basis for finding that the source is reliable or credible and was in a position to know the information provided, as part

41

of the totality of the circumstances analysis. United States v. Dyer, 580 F.3d 386, 390 (6th Cir. 2009); see also Gates, 462 U.S. at 233 (holding that a confidential informants's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances analysis"); Allen, 211 F.3d at 972-73. An informant's veracity or reliability and basis of knowledge are not rigid categories. Allen, 211 F.2d at 972-73. Instead, deficiencies in one aspect can be made up by a strong showing in another. Gates, 462 U.S. at 232-33; Allen, 211 F.2d at 981. Additionally, information provided by a confidential informant can be independently corroborated by law enforcement. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). This independent police corroboration must be "substantial." United States v. Frazier, 423 F.3d 526, 532 (6th Cir. 2005). Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of unincriminating facts can be sufficient to establish probable cause. Gates, 462 U.S. at 243-44. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In the instant case, the confidential informant had a first hand or eyewitness basis of knowledge about the Defendant's involvement in the robbery ring and handling of a shot gun. The affidavit relates that the informant lived with the Defendant [Exh. 1, ¶3] and was a member of the robbery ring led by the Defendant [Exh. 1, ¶2]. Paragraph two of the affidavit states that the informant "stated that he has been operating with a group of individuals under the direction of Jason Jennings Melton." The informant describes [Exh. 1, ¶2 & 3] the way in which the robbery ring operates and a specific robbery in July 2010, for which the informant was present. Finally, the

42

informant states in paragraph five of the affidavit that he was at the River Road residence when the Defendant brandished a sawed-off shotgun. Accordingly, the affidavit provides information showing that the informant had a firsthand basis of knowledge with regard to the information the informant provided.

With regard to the credibility or reliability of the confidential informant, the reliability of a confidential source can be demonstrated, at least in part, by prior occasions on which the informant has provided reliable information, see United States v. Ferguson, 252 F. App'x 714, 721 (6th Cir. 2007), but no such prior occasions are alleged in the instant affidavit. Instead, the affidavit states [Exh. 1, ¶2] that the confidential informant was arrested for robbery by the KPD and immediately began cooperating. Nevertheless, the confidential informant's reliability is supported by the fact that the investigating agents knew his or her identity, even though it was unknown to the issuing commissioner: "The statements of an informant . . ., whose identity was known to the police and who would be subject to prosecution for making a false report, are thus entitled to far greater weight than those of an anonymous source." United States v. May, 399 F.3d 817, 824-25 (6th Cir.2005); see also Dyer, 580 F.3d at 391 (determining that the affidavit showed the reliability of the informant because the informant's identity was known to the police, even though it was not given in the affidavit or known to the issuing magistrate judge). In the instant case, the affidavit does not name the confidential informant, but it shows [Exh. 1, ¶2] that he or she was in custody at the time s/he provided information.

Additionally, the level of detail provided in the confidential informant's accounts of how the robbery ring operated and of the July 2010 robbery and beating support a finding that the source is reliable. See United States v. Gunter, 551 F.3d 472, 480 (6th Cir. 2008) (considering as

a factor supporting the informant's reliability that he provided detailed information of ongoing drug sales); United States v. McCraven, 401 F.3d 693, 697 (6th Cir.) (determining that "a detailed description of what the informant observed first-hand" is another "indicia of the informant's reliability"), cert. denied, 546 U.S. 1010 (2005). In the instant case, the confidential informant described [Exh. 1, ¶2] the way in which the robbery ring selected their victims and perpetrated the robberies: The informant related that the Defendant would obtain the names, addresses, photographs, and the preferred pharmacy of patients obtaining prescriptions for large amounts of narcotics from the Defendant's girlfriend Kristine Burgess, who worked at Bearden Pain Clinic. The informant states that using a Garmin GPS unit, the Defendant locates the victim's residences, and then members of the robbery ring "stake out victims and their residences[.]" The informant also explained that the ring used weapons to commit the robberies and sometimes beat the victims during the robberies. The informant also described [Exh. 1, ¶4] a specific robbery occurring the preceding month. The informant stated s/he was present during the July 2010 robbery, when the Defendant beat the victim with a black polymer club with a lead center, of a type used to check tire pressure.

Importantly, the confidential informant provided this information against his or her own interest, which, in light of the fact that the police knew his or her identity, is another factor supporting his or her reliability. Our Supreme Court has held that the fact that the provision of information is against the informant's penal interest provides a basis for accepting the informant's statement as truthful: "People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their admissions." United States v. Harris, 403 U.S. 573, 583 (1971); United States v. Chafin, 622 F.2d 927, 930 (6th Cir.), cert. denied, 449 U.S. 984 (1980). The Defendant argues that the information from the confidential informant was not against his or her

penal interest because the informant only admitted to being a witness to the July 2010 robbery. The Court finds that the informant admitted being a member of a robbery ring headed by the Defendant, s/he admitted to providing the GPS unit for the ring's use, and s/he admitted to aiding in entering the addresses of victims into the GPS. Looking to the overall description of the informant's involvement in the robbery ring contained in the affidavit, the Court finds that the informant made statements against his or her penal interest, even though she did not describe his or her specific involvement in the July incident.

Moreover, the Court finds that the affidavit contains independent police corroboration of some of the information provided by the confidential source, upon which the issuing commissioner could base a finding that the source is reliable. Law enforcement officers were able to confirm [Exh. 1, ¶3] that the the Defendant and Ms. Burgess drove a Suzuki Forenza, as described by the confidential informant as well as the description of the house provided by the informant. More importantly, the affiant corroborated [Exh. 1, ¶4] that the robbery described by the confidential informant matched KPD's report of an armed robbery and aggravated assault in July 2010, in which the victim was struck with a club-like object. The Court finds that law enforcement corroborated some of the information provided by the confidential informant, particularly the location of the house and the confidential informant's knowledge of a specific robbery and beating that had occurred within the month to six weeks prior to the search.

Accordingly, the Court finds that the affidavit contains information from which the issuing commissioner could conclude that the confidential informant is reliable, namely that the police knew his or her identity, that the informant provided firsthand, detailed descriptions of the crimes, that the informant gave the information against his or her penal interest, and that the police

45

were able to corroborate some of the information. Accordingly, the Court finds that the commissioner properly considered the information of the informant in finding probable cause to issue the search warrant.

*(iii) Staleness*

The Defendant contends that the information from the confidential informant is stale, because the affidavit does not state when the informant observed the Defendant with medical records, a GPS unit, or a shotgun at his residence. Whether information in an affidavit is stale does not depend upon an arbitrary time limitation but is tied to the nature of the crime, the criminal, the location of the search, and the items sought. United States v. Spikes, 158 F.3d 913, 923-24 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).

> [C]ourts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc."

Id. at 923 (quoting Andresen v. State, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975)). The length of time from the events in the affidavit to the warrant application is important but not controlling. Id. at 923. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." United States v. Greene, 250 F.3d 471, 481 (6th Cir. 2001).

In the present case, the Court finds that the affidavit describes an ongoing robbery ring. One of the robberies occurred within a month to six-weeks of the issuance of the search warrant. Moreover, the items to be seized–particularly the GPS unit and the shotgun–are items with

46

enduring value to the Defendant. See United States v. Lancaster, No. 04-5826, 2005 WL 1799385, *5 (6th Cir. July 28, 2005) (determining that information from a confidential informant that he saw the defendant fire a machine gun two years earlier was not stale because "firearms are not perishable items"). The Defendant was entrenched in the location, his residence, which provided a secure operational base. Accordingly, the Court finds that the factors listed in Spikes reveal that the information in the affidavit was not stale.


### (iv) Franks Allegations

Relying on Franks v. Delaware, 438 U.S. 154 (1978), the Defendant argues that the affidavit contains false statements by the confidential informant and a willful omission/false portrayal of pending robbery charges against the Defendant by the affiant. He contends that if the false information is stricken from the affidavit, the affidavit fails to provide probable cause to search the River Road residence. He asserts that he is entitled to a Franks evidentiary hearing to prove that the affidavit contains false statements because the affidavit demonstrates a deliberate and reckless disregard for the truth. To support his contentions, the Defendant has provided the affidavit of Kristine Burgess [Doc. 59, Exh.1] The Government responds that the Defendant has failed to make a substantial preliminary showing that statements by the affiant in the affidavit were deliberately false or made in reckless disregard of the truth.

Generally, in determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." Hatcher, 473 F.2d at 323; see also Whiteley, 401 U.S. at 565. In reviewing the propriety of the search warrant, the Court

considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" Jones, 159 F.3d at 973 (quoting Gates, 462 U.S. at 238-39) (alterations in original). In other words, the Court typically does not look beyond the four corners of the affidavit in assessing whether it provides probable cause.

In Franks v. Delaware, 438 U.S. 154, 155, 164 (1978), the Supreme Court examined whether a defendant ever has the right, pursuant to the Fourth and Fourteenth Amendments, to contest the truthfulness of sworn statements of fact in a search warrant affidavit. Sworn affidavits in support of search warrants are, in the first instance, presumed to be valid. Id. at 171. Nevertheless, a defendant may attack the veracity of factual statements in the affidavit under certain limited circumstances:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56; see also United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). If the defendant makes this showing and is granted what has come to be known as a "Franks hearing," he or she must show by a preponderance of the evidence that the affiant intentionally or recklessly included false statements, which are necessary to the probable cause finding, in the affidavit. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934. If the defendant successfully makes this showing, the evidence gained as a result of the search must be suppressed. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934.

Defendant Melton contends that the confidential informant, whom he believes to be

48

Bobby Wright, the former tenant of the basement level of his home, made multiple false statements about the Defendant to Investigator Butler, which were then included by Butler in the affidavit in support of the search warrant. In order to warrant a <u>Franks</u> hearing, the Defendant "must make a 'substantial preliminary showing' that the false statements originated with the government affiant, not with the informants, or that the government affiant repeated the stories of the [informants] with reckless indifference to the truth." <u>United States v. Giacalone</u>, 853 F.2d 470, 476-77 (6th Cir.), <u>cert. denied</u>, 488 U.S. 910 (1988). The Defendant argues that Investigator Butler knew or should have known that he was relying on false statements from the confidential informant. The Court has reviewed the affidavit of Kristine Burgess and finds that it provides no support, much less a substantial showing, for a conclusion that Investigator Butler knew or should have known that the information from the confidential informant was false. The bulk of the affidavit is about what happened during the search. Ms. Burgess states that she had never seen the Defendant with guns but that in no way disproves the information from the informant that s/he had seen the Defendant with guns. Ms. Burgess states that she and the Defendant borrowed the GPS unit from Bobby Wright to take with them on vacation during the summer and then returned it to Wright upon their return. Ms. Burgess states in her affidavit that she believes that Wright kept the GPS unit in his car after that. This information does not preclude the use of the GPS device for locating the victims of robberies. Accordingly, the Court finds that Ms. Burgess's affidavit does not provide a substantial preliminary showing that the information from the informant was false or that Investigator Butler knew or should have known it was false.

The Defendant also contends that Investigator Butler omitted information that the only basis for the KPD's linking him to the July 2010 robbery and beating is the information it

49

received from the confidential informant after his arrest.  To show that Investigator Butler acted with intent to mislead the commissioner, the Defendant points to the language in paragraph four of the search warrant affidavit, which states as follows:

> 4.  Furthermore, your affiant was notified by the Knoxville Police Department of an armed robbery and aggravated assault that occurred on or about July 2010, where the robbery victim was violently struck with a club like object, where the victim sustained serious bodily injury, as a result of the beating.  *Melton has been identified as the primary suspect, with charges pending.*  Furthermore, CD-1 stated that the club that Melton utilized was a black polymere [sic.] club, with a lead center, which is believed by CD-1 to be used to check tire pressure.  CD-1 has seen Melton with the club inside the target residence since the occurance [sic.] of the robbery and beating.

[Exh. 1, ¶4 (emphasis added)]   The Defendant contends that Investigator Butler placed the italicized sentence in passive voice to avoid relating that it was the confidential informant who identified the Defendant as the primary suspect in the July robbery and beating, rather than independent investigation by the KPD or law enforcement.  The Defendant contends that Investigator Butler deliberately crafted the affidavit in this way in order to mislead the commissioner and to cause her to believe that the KPD had corroborated information from the confidential informant.  He contends that if this sentence is removed from the affidavit, the affidavit will be devoid of probable cause.

The Court also finds that the Defendant has failed make a substantial preliminary showing that Investigator Butler omitted material information from the affidavit.  Material omissions may also merit a <u>Franks</u> hearing in certain circumstances: "Although material omissions are not immune from inquiry under <u>Franks</u>, . . . an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information."  <u>United States v. Adkins</u>, 107 F.3d 1213, 1217 (6th Cir. 1997).  Thus,

50

"except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, Franks is inapplicable to the omission of disputed facts." Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir.), cert. denied, 524 U.S. 942 (1998). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." Adkins, 107 F.3d at 1217.

First, the Court does not find that the sentence in question creates the misleading corroboration that the Defendant claims. Paragraph two of the affidavit states that immediately after his or her arrest by the KPD for armed robbery, the confidential informant began cooperating with law enforcement. Paragraph two goes on to detail the manner in which the Defendant's robbery ring operated. The reasonable inference from this information is that the KPD made the Defendant its primary suspect for the July 2010 robbery based upon the information from the confidential informant. Thus, the Court finds that the information is not necessarily misleading. Second, the Court finds that the Defendant has not shown that the sentence in question is in any way false (i.e., that Melton was not a suspect in the July 2010 robbery). The Court is hard pressed to find that the drafting of a true statement in passive voice rises to the level of a deliberate disregard for the truth. Finally, the Court finds that the alleged omission (that the information causing the Defendant to become the primary suspect in the July 2010 robbery came from the confidential informant and not from the independent investigation of the KPD) is not material. In its analysis in section (iv) above, the Court found that probable cause existed to issue the search warrant and to find the informant to

be reliable without relying on independent investigation by the KPD.

Accordingly, the Court finds that the Defendant has failed to make the requisite preliminary showing that would permit the Court to delve behind the face of the affidavit. The Defendant has failed to show that the affidavit contains either material false information from the affiant or that the affiant omitted material information in a deliberate or reckless attempt to mislead the issuing commissioner.

### (v) Good Faith Exception

Finally, the Government argues that if the Court finds that the search warrant is invalid, the evidence seized from the River Road house should not be subject to the exclusionary rule because the executing officers acted in good faith reliance on the search warrant. Although the Court has found that the search warrant is valid, the Court will briefly address the Government's alternative argument, in the event that the District Court disagrees with the earlier analysis. The Government asserts that a reasonably well-trained officer would have relied on the search warrant issued based upon Investigator Butler's affidavit. Relying upon United States v. Herring, 129 S. Ct. 695 (2009), the Government contends that the executing officers acted in good faith and their actions do not warrant the high societal cost of applying the exclusionary rule. The Defendant argues that the exclusionary rule should apply in this case because Investigator Butler intentionally mislead the issuing commissioner.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983

(6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusionary rule is not applied automatically upon a finding of a Fourth Amendment violation. See Herring, 129 S. Ct. at 700. Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

In the present case, the Government argues that the executing officers reasonably relied on the search warrant issued by Commissioner Chapman and that the search warrant was not facially invalid. In United States v. Leon, the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. 468 U.S. 897, 920 (1984). "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient.

. . . . Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applies despite the officer's reliance upon a judicially-issued search warrant: (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as "'an adjunct law enforcement officer,'" (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid." Id. at 923 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U.S. 590, 610-11 (1975) respectively). The Defendant relies on the first and second of these "exceptions" to the good faith exception.

The Defendant contends that "[t]he police willfully and knowingly based their affidavit on unreliable hearsay, crafted it in such a way as to suggest there was corroborating evidence when there was none, and persuaded the magistrate to sign it." [Doc. 59, p.15] The

Defendant argues that because the officers acted in bad faith in relying upon the affidavit and because they were deliberately deceptive in obtaining the search warrant, this case is one in which the application of the exclusionary rule would have a deterrent effect. The Defendant also summarily asserts that the judicial commissioner was not neutral and detached because the officers misled her, causing her to have insufficient information to make a proper determination.

The Court disagrees with the Defendant's suggestion that the instant affidavit was so "bare bones" and devoid of corroboration that the officers could not rely upon the search warrant in good faith. The four-and-one-half-page affidavit contains detailed, firsthand information from a confidential informant, acting against his or her own penal interest, and some corroboration by independent police investigation. Moreover and more importantly, the Court finds no evidence of a deliberate, reckless, or even grossly negligent attempt to mislead the commissioner on the part of Investigator Butler. In section (iv) above, the Court has already rejected the Defendant's contention that Investigator Butler crafted the affidavit in such a way to cause the commissioner to believe there was independent corroboration by the KPD, when there was not.

Finally, the Defendant has presented no evidence or even a plausible argument that Commissioner Chapman was not neutral and detached when issuing the search warrant. Even if Investigator Butler had attempted to mislead her as the Defendant suggests, such actions by Investigator Butler would not compromise Commissioner Chapman's neutrality. Moreover, the scant evidence before the Court of Commissioner Chapman's role in issuing the search warrant shows that she carefully read and evaluated the affidavit and search warrant, catching and correcting an error in the directions to the River Road house. Accordingly, the Court finds that the <u>Leon</u> good faith exception applies to prevent the use of the exclusionary rule in this case.

55

*(3) Execution of the Search Warrant*

In his motion to suppress, the Defendant argues that the instant search warrant was improperly executed because the officers searched areas beyond the scope of the search warrant, the officers seized items outside the scope of the search warrant and not within the plain view exception, and the execution of the warrant was not noted on its face. The Defendant fails to expound upon these contentions in any of his filings. Accordingly, the Court will address them in the same summary fashion that they are alleged.

The Defendant appears to be arguing that the officers searched areas outside the scope of the search warrant because they searched the downstairs level, which the officers knew or should have known was a separate residence belonging to Bobby Wright and Holly Carr. The search warrant authorized the executing officers to search

> **(535 River Road, Loudon, Tennessee)** (Large white two story single family dwelling with a brick garage and a white garage door on the front right side of the residence. This residence sits ontop of a large hill directly across from Rivers Edge subdivision. This residence is one house east of 543 River Road.)

[Exh. 1] The search warrant expressly states that the residence is a two-story dwelling and does not restrict the officers to the main level. Accordingly, the Court finds that the officers properly searched both the upper and lower floors of the residence.

The Defendant contends that officers seized items outside the scope of the search warrant: "[T]he mistaken information includes the list of items to be seized. This list is not specific enough. The downstairs resident, not the defendant, possessed items that were seized. These items were seized because they were included in the warrant. Yet, they are not attributable to the

56

defendant nor are the[y] relevant in this case." [Doc. 25, p.2] The Defendant also contends that [i]tems not named in the warrant were seized which were not in plain view." [Doc. 25, p.5] The Defendant does not identify any items that he contends were seized outside the scope of the search warrant. First, the Court notes that the search warrant permitted the executing officers to seize items from anywhere in the house. Second, as a practical matter, all of the items seized in the execution of the search warrant were seized from the main level of the residence with the exception of a single .380 bullet. Finally, the Court has no evidence before it that items seized from the River Road residence were not within the list of items that the search warrant authorized the officers to seize.[7]

Lastly, the Defendant asserts that "[n]o execution of the warrant is noted on its face." Doc. 25, p.5] The Government presented a copy of the search warrant [Exh. 14] from the Loudon County Clerk's Office at the April 12, 2011 hearing. This copy of the warrant is stamped returned and filed on August 13, 2010, at 4:22 p.m. The Defendant's contention is without merit. The Court finds no error in the execution of the instant search warrant.

---

[7]The inventory of the items seized in the Search Warrant Return [Exh. 14] includes a "red du[ff]le bag," a "Wheaties baseball cap," and a "white long sleeve tee shirt." The affidavit supporting the search warrant states that the Defendant keeps a red duffle bag containing a Garmin GPS unit used in the perpetration of the robberies at his residence [Exh. 1, ¶3]. Accordingly, the Court finds that the red duffle bag was properly seized as an "item[] of evidentiary value pertaining to armed robberies and aggravated assaults[.]" The Court has no evidence relating to the baseball cap or the t-shirt but declines to find that they were improperly seized because the Defendant did not contend that these items were improperly seized at any of the three evidentiary hearings in this case, thereby preventing the Government from presenting evidence and argument on the propriety of their seizure. In other words, the Court finds that the Defendant has abandoned this argument, if, in fact, he ever intended to raise it.

## B. Admissibility of Defendant's Statements

The Defendant asks the Court to suppress the statements he made to law enforcement on August 12, 2010, and on October 21, 2010, because he contends that they were taken in violation of the Fifth and Sixth Amendments to the United States Constitution.[8]  He contends that the statements should be suppressed because (1) he was in custody and was not advised of the Miranda warnings, (2) he did not voluntarily waive his rights under Miranda, and (3) the statements were made after the Defendant had asserted his right to counsel.  The Government responds that the Defendant's statements were either made voluntarily after the Defendant had been advised of and waived his Miranda rights or were spontaneous, volunteered statements.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself."  In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment.  Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998).  "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Additionally, even when the Miranda warnings are administered, the government

---

[8]The Defendant also summarily asserts that his statements were taken in violation of the Fourth and Fourteenth Amendments to the United States Constitution as well as the Tennessee Constitution and Tennessee law.  The Defendant provides no further explanation of how these constitutional provisions or laws were violated, other than to make the blanket assertion that the statements were the product of an unlawful search.  The Court finds that the Defendant has abandoned these contentions.  Moreover, this Court has already determined that the August 12, 2010 search of the Defendant's residence comported with the Fourth Amendment.

58

must prove that the defendant voluntarily, knowingly, and intelligently waived those <u>Miranda</u> rights before it may introduce an incriminating statement by a defendant. <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. <u>Id.</u> at 168. Finally, once a defendant unequivocally invokes his or her right to counsel, all questioning must cease until counsel is provided, "unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981).

In the instant case, the Defendant challenges three statements occurring on August 12 and October 21, 2010. The first statement occurred when officers executed a search warrant at his house in the early morning hours of August 12, 2010. During the execution of the search warrant, the Defendant was handcuffed and detained on his front porch, where he was interviewed by Investigator Butler. The Defendant provided the following information in the first statement: That he had served nine years in prison and was presently on parole, that he was a member of the Aryan Nation gang; that the officers could search the house; that there was a .380 pistol and a Mossberg shotgun downstairs in the residence of Bobby Wright; that he had handled the Mossberg shotgun in his front yard and had shot the .380 pistol, which has a broken handle, in his side yard; and that Ms. Burgess worked at Bearden Pain Clinic. When Investigator Butler asked the Defendant about recent armed robberies, the Defendant asked to speak to a lawyer due to his criminal history, and Investigator Butler stopped the interview.

The second statement also occurred on August 12, 2010, during the search of the Defendant's residence. The Defendant, who was still handcuffed, was seated on a couch in the living room, while officers searched the adjoining kitchen and dining room area. Sergeant Newman

59

found a shotgun wrapped in a pair of sweatpants behind the stove in the kitchen. When Sergeant Newman spotted the shotgun, he told Investigator Maupin that it was there and was wrapped in some sweatpants. The Defendant said, "He even wrapped 'em up in my jogging pants."

The third statement occurred on October 21, 2010, after the Defendant had been transported to the United States Marshal Service office to await his initial appearance. During the transport, the Defendant asked Special ATF Agent English what his charges were. When they arrived at the Marshal's office, Agent English reviewed the Defendant's file and told the Defendant he was charged with being a felon in possession of a firearm. The Defendant then stated that he knew the guns were at his house and that the guns had been left there by the individual who rented a room from him. The Defendant said that the individual was suppose to have removed the guns but had been arrested and had not done so. The Defendant said that this did not change the fact that he knew the guns were there.

The Court will address the Defendant's specific arguments with regard to each of these three statements.

### A. August 12, 2010 Statement on Porch

The Defendant challenges the August 12, 2010, statement given on the front porch of his house because (1) he was not advised of his rights and did not waive them and (2) the Investigator's claim as to the content of the statement is inaccurate. The Court finds that the evidence presented at the evidentiary hearings in this case contradict these contentions.

In his motion, the Defendant denies that he was advised of the <u>Miranda</u> warnings or that he waived his rights prior to talking with Investigator Butler. During the search of the

60

Defendant's residence, Investigator Butler interviewed the Defendant on the front porch while the Defendant was handcuffed behind his back. Investigator Butler testified that he began advising the Defendant of the <u>Miranda</u> warnings, when the Defendant interrupted him, saying that he understood his rights because he had been in the system before. Investigator Butler told the Defendant that he had to advise the Defendant of his rights anyway and provided the entire rights litany again. Investigator Butler then asked the Defendant if he understood his rights and if he wanted to talk, and the Defendant began talking. Investigator Butler testified that he considered the Defendant's action of engaging in conversation with him to indicate that the Defendant had waived his rights.

Sergeant Newman testified that when he returned to the River Road residence after responding to another call, the Defendant and Investigator Butler were talking on the front porch. As he walked past them to enter the house, Sergeant Newman overheard the Defendant say, "This is not my first time being in trouble with you. I know my rights. It's not my first time being in trouble." Sergeant Newman testified that he did not hear Investigator Butler provide the <u>Miranda</u> warnings or the Defendant waive them.

The Defendant testified that Investigator Butler read him the <u>Miranda</u> warnings from a clipboard. The Defendant said that Investigator Butler asked him if he understood his rights and that he said, "Yes." The Defendant also testified that he signed an acknowledgment of his rights.

The Court finds that Investigator Butler advised the Defendant of his <u>Miranda</u> rights and that the Defendant affirmatively waived them. Investigator Butler's account was corroborated by Sergeant Newman overhearing the portion of the conversation during which the Defendant interrupted Investigator Butler's advice of rights. Moreover, the Defendant admitted that

61

Investigator Butler advised him of the Miranda rights and that he waived them.

Additionally, the Court finds that the Defendant voluntarily waived his Miranda rights. Determining whether an individual has voluntarily waived his right not to incriminate himself is a two-pronged inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). In making the voluntariness inquiry, the Court looks to "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused," . . ., to determine whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time[.]" Daoud v. Davis, 618 F.3d 525, 529 (6th Cir. 2010) (internal quotations omitted) (alterations in original).

In the instant case, the Defendant has multiple, prior felony convictions and insisted at the time that Investigator Butler read him his rights, that he understood his rights because he had been in trouble before. Moreover, the Defendant ultimately declined to answer additional questions without counsel when asked about some robberies. This course of conduct illustrates that the Defendant freely chose to waive his Miranda rights and understood the consequences of doing so. Accordingly, the Court finds that the Defendant voluntarily waived his rights.

Finally, the Defendant disagrees with the content of the statement and the timing of his request for counsel. Both Investigator Butler and the Defendant testified that during the August 12, 2010 statement on the front porch, the Defendant asked not to proceed without counsel. The accounts differ dramatically as to when this occurred and the content of the statement given. Investigator Butler testified that the Defendant willingly talked with him, providing information on his prior criminal record, his gang affiliation, his girlfriend's employer, and firearms that were in the house. Investigator Butler states that it was not until he asked the Defendant about some robberies, that the Defendant declined to answer any more questions without the benefit of counsel.

In contrast, the Defendant testified that as soon as Investigator Butler advised him of the <u>Miranda</u> warnings, Butler asked him if he understood his rights, and the Defendant said, "Yes." Investigator Butler asked if the Defendant would like to have an attorney present during questioning, and the Defendant replied, "Well, yeah, I would, if you don't mind." Butler moved the Defendant's handcuffs to the front, so the Defendant could sign a sheet acknowledging his rights and saying that he wanted an attorney, then moved them behind him again. The Defendant testified that Investigator Butler then commented that the Defendant had an opportunity to help himself but said that he chose not to talk to Investigator Butler. He denied telling Investigator Butler that Ms. Burgess worked at Bearden Pain Clinic, that he had spent nine years in prison, that he was in the Aryan Nation, that he had held a sawed-off shotgun in his front yard, or that he had shot a .380 pistol with a broken handle. He said that he did not know that Investigator Butler was investigating armed robberies. The Defendant stated that, instead, he only made two requests of Investigator Butler: He told Butler that he wanted an attorney present and he asked to go inside because it was raining, and he was cold.

The Court credits the testimony of Investigator Butler over that of the Defendant. First, the level of detail in the information Investigator Butler testified the Defendant gave, such as that he had been in prison for nine years and that he was a member of the Aryan Nation, supports the truthfulness of Investigator Butler's account. Second, the Court finds it untenable that the Defendant would have signed a document acknowledging his rights and the Government, in proving that the Defendant was provided the <u>Miranda</u> warnings, would not have introduced that document as a part of its proof. Finally, at the May 3, 2011 hearing, the Defendant stated that he would not be forthcoming with the truth, if he believed that it would disadvantage him:

> You get up here [on the witness stand] and that woman ask you to take and oath, you put your had up and say you are going to tell the truth. I can't ask for the same, I can't sit here and criticize people for not telling the truth and get up here and do it myself. I am not going to incriminate myself, if I can help it. . . . .
>
> This is honest. To the best of my ability I want to be honest without hurting myself. . . . .

[Doc. 82, p.20] The Court finds that this testimony reveals that the Defendant is willing to manipulate his testimony when it would work to his advantage. Accordingly, the Court finds that the Defendant made the statements attributed to him by Investigator Butler and that Investigator Butler ended the interview, when the Defendant requested counsel.

## B. August 12, 2010 Statement in Living Room

The Defendant argues that at the time he made the second statement on August 12, 2010, he was in custody and had expressly invoked his right to counsel. He asserts that the officers

improperly interrogated him by making a comment or asking a rhetorical question in his presence that was designed to provoke him to answer. The Government contends that the Defendant volunteered the statement, "He even wrapped 'em in my jogging pants," upon the officers retrieving the shotgun from behind the stove.

First, the Court notes that it has already found that Investigator Butler provided the Defendant an advice of rights and the Defendant agreed he understood and waived those rights, within an hour of the discovery of the shotgun. The Defendant had also declined to speak further with Investigator Butler without counsel present, so Investigator Butler had ended the interview. Investigator Butler placed the Defendant, who remained handcuffed, on the living room couch and returned to the search of the residence. During this time, the Defendant was permitted to smoke a cigarette.

Near the end of the search, Sergeant Newman discovered a shotgun wrapped in a pair of sweatpants and hidden behind the stove in the kitchen. The kitchen and dining room of the residence are open to the living room through a set of French doors. Sergeant Newman testified that when he found the shotgun, he told Investigator Maupin that the shotgun was there and was wrapped in some jogging pants. Sergeant Newman said the Defendant, who was sitting in the living room, stated, "He even wrapped 'em up in my jogging pants." Sergeant Newman said that his comment about finding the shotgun was not directed to the Defendant, who was in the next room.

The Defendant testified that when he saw the shotgun wrapped in sweatpants, he said something like, "He even put them in my sweatpants[.]" The Defendant did not testify about any comments or questions by the officers that preceded his statement.

Generally, "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]" Miranda, 384 U.S. at 478. As stated above, once a defendant unequivocally invokes his or her right to counsel, all questioning must cease until counsel is provided, "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. "'Interrogation' includes express questioning and its functional equivalent. The Supreme Court in Rhode Island v. Innis, 446 U.S. 291, 301, . . . (1980)[,] defined interrogation as "not only . . . express questioning, but also . . . any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Soto, 953 F.2d 263, 264 (6th Cir. 1992). In Soto, the appellate court held that the officer's comment "What are you doing with crap like that [gesturing toward a bag containing cocaine] when you have these two waiting for you at home?" upon discovering a photograph of the defendant's wife and child in his luggage was "in substance . . . a direct inquiry into [the defendant's] reasons for committing the offense he appeared to have committed, and it elicited an inculpatory response." Id. at 265.

In the present case, Sergeant Newman's comment to Investigator Maupin that he had found a shotgun wrapped in sweatpants behind the stove, was not directed toward the Defendant, who was in the next room, albeit within earshot and possibly within sight of Sergeant Newman. Nor was Sergeant Newman's comment of a type that was reasonably likely to have elicited an incriminating response[9] from the Defendant. Finally, the Court observes that the Defendant did not testify to any question or comment that preceded the second statement. Moreover, there is no

---

[9]The Court notes that the Defendant's exclamation that another person had wrapped a shotgun in the Defendant's sweatpants is not necessarily incriminating to the Defendant.

66

evidence that the officers displayed the shotgun to the Defendant in an attempt to evoke a statement. Accordingly, the Court finds that the Defendant's second statement was volunteered and not in response to any questions, comments, or actions by the officers.

### C.  October 21, 2010 Statement

Finally, the Defendant challenges the admissibility of this third statement given on October 21, 2010, at the Marshal's office.  He contends that this statement was unwarned, that he did not waive his rights, and that Agent English inaccurately related the substance of his statement. The Government responds that the Defendant received advice of and waived his rights prior to making his third statement, which in any event was also volunteered.

In his motion, the Defendant argues that he was not advised of the Miranda warnings on October 21, 2010.  Sergeant Amburn, who transported the Defendant to the ATF office on October 21, 2010, testified that he read the Defendant the Miranda rights in Agent English's presence.  He said he asked the Defendant if he understood these rights.  He stated that the Defendant asked whether he had the right to stop answering questions at any time and that he confirmed that he did.  Agent English testified that he observed Sergeant Amburn give the Miranda warnings to the Defendant at the ATF office.  Agent English stated that the Defendant said he understood his rights and asked a question relating to his ability to stop answering questions.  At the April 12 hearing, the Defendant testified that at no point on October 21, 2010, was he advised of the Miranda warnings.

Shortly thereafter, the Defendant wrote a letter to the Court, stating that he may have had an epileptic seizure induced by a fire alarm on October 21, 2010, and may not have realized that

67

the agents advised him of his rights. At the reopened suppression hearing on May 3, the Defendant testified that he had previously been diagnosed with juvenile epilepsy but believed that he had outgrown it. He stated that while seated in the break room at the ATF office, he observed a flashing light on a fire alarm. He stated that he began to feel like he was having a seizure and placed his hand over his eyes. He stated that he went in and out of consciousness and recalled one of the agents asking if he was ok. He said that the agents may have advised him of the Miranda warnings during this seizure. Both Sergeant Amburn and Agent English testified that a fire alarm with a flashing light occurred on the morning of October 21, 2010, but Agent English stated that it lasted one minute or less. Both testified that they noticed no change in the Defendant's behavior during or after the fire alarm. Sergeant Amburn stated that after the fire alarm, he and the Defendant engaged in "lighthearted conversation" and commented that fire alarms are annoying." Agent English stated that the Defendant spoke and acted the same after the fire alarm as he had before it and that he did not express any medical concerns at that time.

The Court finds that Sergeant Amburn advised the Defendant of his rights at the ATF office on October 21, 2010, and that the Defendant acknowledged that he understood his rights. In support of their testimony, both officers recalled the Defendant asking a specific question about his ability to end the questioning. On the other hand, the Court rejects the Defendant's testimony that he experienced an epileptic seizure that morning that prevented him from hearing the advice of rights or, presumably, from understanding those rights. The Defendant, who had not had an epileptic seizure in approximately eleven years and who was exposed to a strobe light for no more than sixty seconds, did not behave differently or make any complaint following the fire alarm. Moreover, the Defendant's seizure symptoms–feeling his throat tighten and like he was going in and out of

68

consciousness–differed dramatically from his prior seizures, which involved violent behavior such as head-butting a wall. Finally, as discussed above, the Court finds that the Defendant lacks credibility and exhibits a willingness to manipulate the truth to fit his purposes. Accordingly, the Court finds that the Defendant did receive and waive his rights on the morning of October 21, 2010.

The Court also finds that the Defendant's subsequent statement to Agent English was volunteered. The Court finds that en route to the Marshal's office, the Defendant asked Sergeant Amburn and Agent English what his charges were. Agent English responded that he did not know but would tell the Defendant once they got to the Marshal's office and he had a chance to look at the Defendant's file. Upon reviewing the Defendant's file, Agent English answered the Defendant's question, telling the Defendant that he was charged with being a felon in possession of a firearm. At that point and with no questioning from Agent English, the Defendant gave his third statement. The Court finds that Agent English said nothing designed to invoke an incriminating response from the Defendant. See Soto, 953 F.2d at 264. Accordingly, the Court finds that the Defendant's third statement is admissible as a voluntary remark by the Defendant.

Finally, at the May 3 hearing, the Defendant objected to Agent English's account of his third statement. Agent English testified that the Defendant, upon hearing that he was charged with being a felon in possession of a firearm, stated that he knew the guns were there and that they had been left by a tenant. The Defendant said that the tenant was suppose to have removed the guns but had not done so. Agent English said that the Defendant paused and then said that does not change the fact that he knew the guns were there. The Defendant testified that Agent English had "mis-remembered" what he said in the Marshal's office. The Defendant agreed that he told Agent English that he knew the guns were there when Bobby Wright first came to his residence. He stated

69

that he said he told Wright to remove the guns and that Wright was suppose to have removed them but was arrested.  He denied saying the last part, that it did not change the fact that he knew the guns were there.  First, the Court finds that the two accounts of the Defendant's third statement are not that dissimilar.  Second, the Court finds that the Defendant's testimony is not credible and accredits Agent English's account of the Defendant's third statement.

For the reasons stated above, the Court recommends that the Motion to Suppress Defendant's Statements be denied.

## V.  CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence seized in the August 12, 2010 search of the Defendant's home or any of the Defendant's statements.  For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress Defendant's Statements [**Doc. 24**] and Motion to Suppress Search Warrant and Evidence Recovered [**Doc. 25**] should be **DENIED**.[10]

Respectfully submitted,

s/ H. Bruce Guyton
United States Magistrate Judge

---

[10]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).